## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | | |
|---|---|---|
| **ADZARI ORDONEZ, and** | § | |
| **EDUARDO HOLGUIN,** | § | |
| *Plaintiffs,* | § | |
| | § | |
| **vs.** | § | |
| | § | |
| **OFFICER D. GONZALEZ (#3226),** | § | |
| **OFFICER EUGENE A. PINEDA** | § | CIVIL ACTION NO.: |
| **(#3526), OFFICER J. GALLARDO** | § | |
| **(#3395), OFFICER BENJAMIN** | § | Hon. |
| **JURADO, JR. (#3274), OFFICER** | § | |
| **CLAUDIA CAMPA (#3502),** | § | |
| **OFFICER C. HERNANDEZ** | § | |
| **(#3273), JOHN DOE OFFICERS,** | § | |
| **and THE CITY OF EL PASO,** | § | |
| *Defendants.* | § | |

---

## COMPLAINT AND DEMAND FOR JURY TRIAL

---

NOW COME Plaintiffs, **ADZARI ORDONEZ ("Ordonez")** and **EDUARDO HOLGUIN ("Holguin"),** by and through their attorney, Brandon J. Grable of Grable Grimshaw PLLC, complaining of Defendants, the **CITY OF EL PASO, OFFICER D. GONZALEZ** (Badge #3226), **OFFICER EUGENE A. PINEDA** (Badge #3526), **OFFICER J. GALLARDO** (Badge #3395), **OFFICER BENJAMIN JURADO, JR.** (Badge #3274), **OFFICER CLAUDIA CAMPA** (Badge #3502), **OFFICER C. HERNANDEZ** (Badge #3273), and **JOHN DOE OFFICERS,** and respectfully alleging as follows:

## INTRODUCTION

1.      In this State, citizens have a First Amendment right to film police officers performing their duties.  In direct response to Ms. Ordonez exercising this right while in her driveway, she and her father, Mr. Holguin, were retaliated against, after El Paso police officers unlawfully seized, assaulted, and falsely arrested Plaintiffs after following them into their home.  This is because the City of El Paso criminalizes speech and the filming of its police officers (unless the individual filming has a discretionary permit).  The City of El Paso stands behind its police officers that violate its citizens' First Amendment rights through discretionary investigations and lack of discipline and training procedures.

2.      Plaintiffs ADZARI ORDONEZ and EDUARDO HOLGUIN bring this civil action for damages against THE CITY OF EL PASO (including the CITY MANAGER and more specifically, the CITY OF EL PASO POLICE DEPARTMENT ("EPPD") with its POLICE CHIEF) and City of El Paso police officers EUGENE A. PINEDA, D. GONZALEZ, J. GALLARDO, BENJAMIN JURADO, JR., CLAUDIA CAMPA, C. HERNANDEZ, and JOHN DOE OFFICERS for several constitutional violations that Plaintiffs suffered. These violations include the unlawful detention and arrest of Plaintiffs by Defendant Officers D. Gonzalez, Eugene A. Pineda, J. Gallardo, Benjamin Jurado, Jr., Claudia Campa and C. Hernandez, because Plaintiff Ordonez was filming the police at her

main residence—a constitutionally protected activity. Plaintiffs Ordonez and Holguin bring this civil action for damages against the City of El Paso and its police officers for violating Plaintiffs' rights under the First and Fourth Amendments of the United States Constitution and pursuant to 42 U.S.C. § 1983.

3.      Plaintiffs allege that the CITY OF EL PASO and its policymakers, City Manager TOMMY GONZALEZ ("Gonzalez"), Chief of Police GREG ALLEN ("Allen"),[1] the El Paso CITY COUNCIL (Peter Svarzbein, Alexsandra Annello, Cassandra Hernandez, Joe Molinar, Isabel Salcido, Claudia Lizette Rodriguez, Henry Rivera, and Cissy Lizarraga)("Council"), and Mayor of El Paso, Oscar Leeser ("Leeser") (collectively referred herein as the "Policymakers") failed to properly train, supervise, screen, discipline, transfer, counsel or otherwise control officers who are known, or who should have been known, to engage in the use of excessive force against those engaged in constitutionally protected activity, including those officers repeatedly accused of such acts.  The Policymakers, specifically City Manager Gonzalez, along with Chief of Police Allen, had a duty, but failed to implement and/or enforce policies, practices, and procedures for the El Paso Police Department that respected Plaintiffs' constitutional rights. These incidents clearly violated Plaintiffs' rights afforded to them under the United States Constitution and

---

[1] Police Chief Greg Allen passed away on January 17, 2023.  Former Assistant Police Chief Peter Pacillas is the current interim Chief of Police.

Section 1983.  The city of El Paso's failure to train and supervise its officers on the constitutional rights of citizens was entirely predictable and these failures resulted in Plaintiffs being assaulted during their unlawful arrests, which caused them unwarranted physical pain and mental anguish.  Defendants Gonzalez, Pineda, Gallardo, Jurado, Campa, Hernandez, and John Doe Officer consciously disregarded the rights of Plaintiffs, knowing that the Policymakers would ratify and/or approve of their actions, which Chief Allen did by failing to investigate or properly discipline the actions of these police officers.

4.    Plaintiffs were harmed and seek answers and compensation for their damages in this lawsuit.

## JURISDICTION AND VENUE

5.    This is a civil rights action in which the Plaintiffs seek relief for the violations of their rights secured by 42 U.S.C. § 1983 and the First and Fourth Amendments.

6.    Jurisdiction of this Court is found upon 28 U.S.C. § 1331.

7.    Venue is properly laid in the Western District of Texas, El Paso Division under 28 U.S.C. § 1391(b)(2).

8.    The events that gave rise to this lawsuit took place at the residence of 8730 Winchester Rd., and 8736 Winchester Rd., both located in El Paso, El Paso County, Texas.

9.      Pursuant to 42 U.S.C. § 1983, and other applicable laws, the Court may award nominal, compensatory, and punitive damages, as well as equitable relief against all of the Defendants in their individual capacity, for the violations of Plaintiffs' constitutional rights and harm caused by their actions/inactions.

## PARTIES

10.      Plaintiff **ADZARI ORDONEZ** ("Plaintiff Ordonez") is a law-abiding citizen of the United States and a resident of the City of El Paso, County of El Paso, State of Texas.  She is Eduardo Holguin's daughter.

11.      Plaintiff **EDUARDO HOLGUIN** ("Plaintiff Holguin") is a law-abiding citizen of the United States and a resident of the City of El Paso, County of El Paso, State of Texas.  He is Adzari Ordonez's father.

12.      Defendant **CITY OF EL PASO** ("Defendant City") is a political subdivision of the State of Texas, acting under the color of state law, and is a person for the purposes of a 42 U.S.C. § 1983 action.  Defendant is responsible for the policies, practices, and procedures of its Police Department and individual officers. Defendant City is also responsible for the policies implemented, endorsed, and enforced by its Policymakers.

13.      Defendant **D. GONZALEZ** (Badge #3226) ("Defendant Gonzalez") was at all pertinent times a police officer employed by the City of El Paso and was at all pertinent times acting under color of state law in performance of her duties as

an El Paso police officer.

14.     Defendant **EUGENE A. PINEDA** (Badge #3526) ("Defendant Pineda") was at all pertinent times a police officer employed by the City of El Paso and was at all pertinent times acting under color of state law in performance of his duties as an El Paso police officer.

15.     Defendant **J. GALLARDO** (Badge #3395) ("Defendant Gallardo") was at all pertinent times a police officer employed by the City of El Paso and was at all pertinent times acting under color of state law in performance of his duties as an El Paso police officer.

16.     Defendant **BENJAMIN JURADO, JR.,** (Badge #3274) ("Defendant Jurado") was at all pertinent times a police officer employed by the City of El Paso and was at all pertinent times acting under color of state law in performance of his duties as an El Paso police officer.

17.     Defendant **CLAUDIA CAMPA** (Badge #3502) ("Defendant Campa") was at all pertinent times a police officer employed by the City of El Paso and was at all pertinent times acting under color of state law in performance of her duties as an El Paso police officer.

18.     Defendant **C. HERNANDEZ** (Badge #3273) ("Defendant Hernandez") was at all pertinent times a police officer employed by the City of El Paso and was at all pertinent times acting under color of state law in performance of

his duties as an El Paso police officer.

19.     Defendant **JOHN DOE OFFICERS** ("Defendant John Doe(s)") were at all pertinent times police officers employed by the City of El Paso and were at all pertinent times acting under color of state law in performance of their duties as El Paso police officers.

20.     Each and all of the acts of Defendants alleged herein were committed by said Officers while acting within the scope of their employment with Defendant City, as law enforcement officers for the El Paso Police Department.

21.     Each and all of the acts of Defendants were committed by said Officers despite their knowledge that they were engaging in unlawful and unconstitutional acts.  Yet despite this knowledge, they did them anyway, knowingly, recklessly, intentionally, wantonly, callously, purposely, purposefully, sadistically, cruelly, deliberately, and/or with deliberate indifference, gross negligence, and/or reckless disregard.

## STATEMENT OF FACTS

22.     El Paso is a border town.  This far-west Texas town, the historical home of the Ysleta del Sur Pueblo tribe, Franciscan friars, Spanish refugees, U.S. Army officers, and old west gunfighters, has a history spanning over 400 years.  This population center, now divided by political lines, sprawls across New Mexico state lines in the form of various communities and cities, like, Sunland Park, New Mexico;

and mirrors the metropolis of Ciudad Juárez, Chihuahua, Mexico, split by a border fence and the Rio Grande.  The result of these various influences is a colorful mix of cultures grounded by years of tradition.

23.    Plaintiff Eduardo Holguin's family has lived in this area for generations, long before current state lines or country borders divided the region. Mr. Holguin, himself, has resided his whole life—from a child to an adult with children of his own—in the same house, now passed down to him from his parents, in the Pueblos Viejos neighborhood of El Paso.

24.    These deep roots have also created a deep connection in Plaintiff Holguin and his family with the city of El Paso.  His son, Eddie Holguin, Jr., served on the El Paso City Council for nine years, and his daughter-in-law Iliana, is the current County Commissioner for Precinct 3.   Plaintiff, himself, has friends throughout the city, known from years of going to the same schools and the same community events.

25.    It could be understood, then, if Mr. Holguin planned to live his sunset years peacefully in the community he had always called home.

26.    Defendant Officers robbed him—and his daughters—of that peace.

**A. Plaintiff Ordonez documents family violence statement**

27.    In the early afternoon of Sunday, April 18, 2021, at or around 1:00 P.M.,

Ms. Ordonez was in the shower when a close female relative called her, sobbing.[2] The teenager had been a victim of family violence and needed emotional support.

28.    Ordonez's relative, who was distraught from the situation that had occurred, also requested that Ordonez film her giving her statement to the police. She feared being to upset to remember what she would say about the incident involving her father, she was concerned for her safety, and she wanted to avoid any discrepancies within her statement; she also wanted a record to help her remember and to show to her mother when she arrived home.

29.    Ms. Ordonez alerted her father (Plaintiff Holguin), and sister to the situation, and then, as soon as she could, hurried to join them in comforting her female relative at her home.

30.    Mr. Holguin's house is located two houses down from the residence of this relative and her family.  At the time, Ordonez stayed at this female relative's house during the week and spent weekends at her father's house with her sister.  On the day in question—Sunday—Ms. Ordonez was staying at  Holguin's house.

31.    As a result of this geographical closeness, the family members gathered on the sidewalk outside the female minor's home, then stayed there while they waited for the El Paso police officers, who had already made scene, to exit their vehicle.  This was around 1:50 P.M.

---

[2] This relative was underage during the incidents in question.  Plaintiffs seek to protect her identity.



32.    After El Paso police officers Defendants Gonzalez and Pineda joined the family on the sidewalk, Plaintiff Ordonez joined the group.

33.    The family and officers moved up by the front door of the house so the officers could discreetly take the minor's statement.  While the female relative spoke with Defendant Pineda, a probationary officer under the supervision of Defendant Gonzalez, Ms. Ordonez filmed the conversation as requested, standing at least 3-4 feet to the side of both Defendant Officers.  Her sister stood near her.  Confident that the situation was under control, Mr. Holguin left his daughters and the female minor with the officers and returned to his home.



34.     The police officers knew that Ms. Ordonez and her sister were present during their investigation. Ms. Ordonez's presence was not at issue.

35.     As the relative began making her statement, Ms. Ordonez began filming. After five or so minutes, Defendant Gonzalez noticed Plaintiff Ordonez recording the interaction on her phone. Defendant Gonzalez informed Ms. Ordonez that "this is an investigation," before issuing an unlawful ultimatum: either turn off her camera, or the officer would seize her phone. Again, it was not Ms. Ordonez's presence that was the issue—it was her filming the police interaction while standing on her driveway.



36.     Ms. Ordonez responded by asking Defendant Gonzalez for her name and badge number. Defendant Gonzalez gestured to her visible name tag and badge and told Plaintiff Ordonez that she could read them.

37.     While Ms. Ordonez tried to read her name on the shiny silver badge, Defendant Gonzalez again threatened to take the phone.  Without waiting for a reply, Defendant Gonzalez advanced toward Plaintiff Ordonez and forcibly took her phone out of her hand and threw it on the ground, shattering Plaintiff Ordonez's phone screen and ending her recording.  Defendant Pineda did not intervene.



38.     Upset at this blatant violation of her constitutional rights, Ms. Ordonez picked her phone back up and started recording again.  She informed Gonzalez and Pineda that her filming was her right.  Plaintiff Ordonez's protests that this activity was protected under the First Amendment were ignored.

39.     Ms. Ordonez's sister, with her hands up, moved into a position between Plaintiff and Gonzalez.  Plaintiff Ordonez continued questioning Defendant Gonzalez's actions and again informed Defendant Officers that recording was within her rights.



40.     Defendant Pineda, a rookie officer, told Ms. Ordonez she could record;



she just needed to stand back.  When Ms. Ordonez asked for his name and badge number, he told her he would give her that information in a minute.  Ms.  Ordonez also complained to him that there was no reason for Defendant Gonzalez to touch her or to get physical.

41.     Faced with verbal criticism from Ms. Ordonez and her sister, Defendant Gonzalez then, without lawful authority, demanded that they leave under threat of arrest for "interfering."



42.     Ms. Ordonez inquired how she was interfering as she stood a safe distance away, was on property where she had a right to be and was filming the interaction at the request of her relative making the report to police.  Rather than provide clarification, Defendant Gonzalez advanced toward the sisters in an aggressive manner while threatening them multiple times that she would arrest them for "interference" if they did not leave.  As Plaintiff Ordonez protested that there was no reason for Defendant Gonzalez to arrest her, Defendant Gonzalez grabbed her sister's wrist, attempting to arrest her.

43.    Plaintiff Ordonez's sister pulled her arms away, breaking Defendant Gonzalez's grip.  She informed the officer that she would not hit her, before ordering the officer not to touch her.

44.    As Defendant Gonzalez radioed dispatch for a supervisor, Mr. Holguin returned.  Both teenagers informed their father that the officer had assaulted them because Ms. Ordonez had been filming.  Plaintiff Holguin, knowing the law, informed his daughters that the officer could not arrest them for that.  Determining that it was not safe for his daughters to stay, he told them, "Let's go," and guided them in the direction of his house.



45.    Seeing them leave—as Defendant Gonzalez had previously demanded multiple times that they do—Defendant Gonzalez protested that both girls were now under arrest.  As Plaintiffs kept walking away, Defendant Gonzalez threatened to add an evading arrest charge to her unlawful arrest for interference.  The family, knowing that she lacked a lawful basis for either charge, continued walking across their neighbor's driveway back toward their home.

46.    Defendant Pineda abandoned Plaintiff's female relative that he had been assisting and joined Defendant Gonzalez in chasing Ms. Ordonez and her sister. Fearful of something worse than an unlawful arrest happening, Ms. Ordonez and her

sister started running.





47.    Following behind them, their father, Mr. Holguin, yelled at the girls to get out of there and to lock the door. As the girls tried to obey their father, Defendant Officers grabbed Plaintiff's sister and started trying to pull her away from her home, claiming she was under arrest. Mr. Holguin rebuked the Defendant Officers, telling

them to leave the girls alone, because they were just children.  Ms. Ordonez grabbed her sister by the arm and pulled her inside.  She then wrapped her arms around her father's waist and pulled him inside as well.  Mr. Holguin held onto the door as his daughter pulled him to safety, enabling him to shut the door, which he then locked.  Through the locked metal screen door, he again told the officers to leave and rebuked them for messing with children.

48.    As the officers left, Mr. Holguin demanded to know what had happened.  The girls explained that they had just been recording their female relative's statement when the female officer, Defendant Gonzalez, started grabbing and pushing them and took Plaintiff Ordonez's phone.

**B. Defendant Officers assault Plaintiffs**

49.    While Plaintiffs temporarily felt safe in their own home, it was just the beginning.

50.    Defendant Officers returned to speak with the female relative.  At this point, having witnessed the officers attack and chase her family members, she refused to continue speaking with them.  When she walked away from the officers, they started following her.  She ran away from Defendants Gonzalez and Pineda to Mr. Holguin's house, the officers following her the whole way.

51.    Once she was safely inside the house away from the Defendant Officers, Defendants Gonzalez and Pineda lingered outside Holguin's home.

52.    Defendant Officers wanted Ms. Ordonez's phone to prevent the recording of them getting out to the public.  They were not wearing anybody worn cameras, and they were likely unaware that they were also captured on surveillance video.  These officers hoped to send a message to Plaintiffs that exercising their First Amendment rights would not be tolerated.





53.    A few minutes later, other officers started arriving on scene: Defendant Officers J. Gallardo, B. Jurado, C. Campa and C. Hernandez. The officers gathered



to discuss the situation, before approaching Plaintiffs' home.

54.    Without consent, a warrant, or exigent circumstances, Defendant Officers approached Plaintiff Holguin's home.  While standing in the driveway in front of his locked fence, a Defendant Officer shouted, "We want to talk to you," at Mr. Holguin.  He inquired if they had a warrant, which they did not.

55.    At this moment, Ordonez's sister shouted, "Dad!" at their father. Plaintiff Holguin, believing that more officers might be approaching his house from the back and concerned for his daughter's safety, turned around.

56.    Defendants Gonzalez, Pineda, Gallardo, Jurado, Campa, and Hernandez, acting more like the "rough" officers who founded the El Paso Police Department during the wild west than as servants and protectors of the public, used that moment to jump the fence onto Plaintiffs' private property, claiming they did not need a warrant.[3]  Defendant Officer Hernandez led the way.

---

[3]  "Early in EPPD history, the city marshal was often the 'worst of the worse', [sic] due to the necessity of the city marshal having to always display a 'rough' reputation so they would not be challenged by the 'bad guys'. [sic]" https://www.elpasotexas.gov/police-department/. Accessed on December 5, 2022.



57.     Immediately, while his back was still turned to them, Defendant Officers surrounded Plaintiff Holguin, tackling and kicking him to drop him to the ground while shouting aloud for him to stop resisting—even though Holguin did not resist (and was not able to).  Once Defendant Officers finished their assault on the battered Plaintiff, they placed him in handcuffs.

58.     Plaintiff Ordonez, seeing Defendant Officers attacking her father, stepped outside.  She joined her sister in shouting at the officers to let him go. Defendant Officer Gallardo ordered Plaintiff Ordonez's sister to stop and have a seat.  The teenage girl complied and was placed in handcuffs.

59.     Ms. Ordonez, meanwhile, noticing that two officers were attempting to enter their home through the back door, yelled at them, advising Defendant Officers that they could not enter their home.  Upon hearing this, Defendants Hernandez and Gonzalez grabbed her arms, leg-swiped her, and forcefully brought her to the

ground.  Officer Campa assisted the two officers in handcuffing her.

60.     All three Defendant Officers forcefully applied pressure to Ms. Ordonez's back.  Plaintiff Ordonez weighs about 110 pounds.  The force applied to her back by Defendants Hernandez, Gonzalez, and Campa affected her ability to breathe.  She lifted her head up, to articulate her lack of air flow as Defendant Officers were handcuffing her.  Before she could get the words to come out, Defendant Gonzalez—delivering  her intended message—ran her fingers through the eighteen-year-old's scalp and slammed her head into the ground.  This caused Ms. Ordonez to suffer a busted lip and headaches.  Plaintiff's relative, who had just been attacked by her father, now watched from inside the home as the police officers she had called to assist her just brutally assaulted her family members.

61.     After Defendant Officers handcuffed Ms. Ordonez, they tried to open the back door to Holguin's home, claiming it was an attempt to retrieve all "suspects."  Plaintiff Ordonez tried to say "Stop!" to the Defendant Officers, but she had difficulty as she was gasping for air.

62.     Defendant Officers then demanded that Mr. Holguin tell them the location of the key to unlock the gate that they had jumped over.  If he did not tell

him, they threatened to throw the handcuffed Plaintiff over it.  Not wanting to be

thrown, Plaintiff Holguin provided the location for the key, and Defendant Officers

unlocked the gate.  Plaintiffs were escorted in handcuffs to the waiting patrol cars.



63.    At no time did anyone give consent for Defendant Officers to enter

Plaintiff Holguin's property, yet Defendants Gonzalez, Pineda, Gallardo, Jurado,

Campa and Hernandez did just that.

## C. After the unlawful arrest

64.    After both sisters and their father were escorted to different patrol cars,

Defendant Officers demanded the three family members identify themselves.  Ms.

Ordonez identified herself.  When Defendant Officers demanded that Mr. Holguin

give them his name, he responded by asking for them to give him a lawful arrest.  In

retaliation, Defendant Gonzalez began hitting him with her knees.  When he still

failed to identify himself, she roughly pulled him out of the patrol car and began

banging his left shoulder against the side of the car multiple times.   Another

Defendant Officer tried to take his fingerprints on their phone. At this point, Mr. Holguin provided his name because Defendant Gonzalez's actions were causing him significant pain in his shoulder.

65.    Plaintiffs' neighbor witnessed this abuse by Defendant Gonzalez.

66.    Shortly after, a Defendant John Doe arrived on scene. Defendant Officers briefed this officer on the situation. This officer did not intervene to release Plaintiffs from their unlawful arrests conducted without warrants for charges based on Plaintiff Ordonez filming her relative's statement at her request. Instead, Defendant John Doe condoned Defendant Officers' actions.








67.    After Defendant John Doe arrived, Defendant Pineda took several photos of the scene.[4]

68.    Shortly after this, Defendant Officers left the scene with the handcuffed Plaintiffs.  The family remained in handcuffs for ten to twelve hours at the substation, before they were transferred to the jail.  During this time, no one spoke to Plaintiffs.  They remained in handcuffs and chained to chairs.  Plaintiff Holguin was kept barefoot for their entire, hours-long stay.  His feet being forced on the cold cement floor caused both physical and psychological harm.  The handcuffs caused

---

[4] The El Paso Police Department, a department with over 1,000 police officers and five regional command centers, purchased 34 BWCs in 2018.  EPPD did not purchase more cameras until March of 2022 (almost a year after the incident in question) when the El Paso City Council approved the $6.6 million purchase of 700 more BWCs and 410 mobile video recorders for the department to be used by patrol and traffic officers.

damage to Mr. Holguin's wrists and hands.

69.    Defendant Officers did not provide food or water the entire time they were at the substation.  None of them were offered medical treatment.  Plaintiffs had to request to be allowed to use the restroom.  During this time, both Plaintiffs sat watching Defendant Gonzalez direct Defendant Pineda on how to write his report.

70.    The Plaintiffs were eventually transferred to the jail.   They were brought before a magistrate four hours later, and eventually bonded out by 6:30 A.M.

71.    Charges were initially brought against Plaintiffs.  Plaintiff Ordonez was charged with "Interfering with Public Duties," "Evading Arrest/Detention," and "Resisting Arrest or Transport." Plaintiff Holguin was charged with "Interfering with Public Duties" and "Resisting Arrest or Transport."  All criminal charges were dropped minutes before their arraignment.

72.    After the incident, Plaintiff Holguin, an electrician, has had trouble working because his wrists are in dire pain.  This prevents him from using and gripping certain tools and door handles.  He has so far been unable to meet the physical demands of his day-to-day job, instead, restricted to taking on very small troubleshooting maintenance jobs to make enough income for his family to get by.

73.    Plaintiff Holguin has also suffered psychological trauma.  He was falsely arrested by officers who failed to procure a warrant.  His home was invaded. His daughters were assaulted in front of him.  He was treated like an animal when

they threw him in a cell, handcuffed, with no shoes or socks while depriving him of necessities such as food and water.

74.    At no time did any officers intervened to help Plaintiffs.  Not one person questioned Defendant Gonzalez's conduct.  The city did not hold their officers responsible by properly training or disciplining them.  The rule of law was completely flouted; the Constitution trampled over with impunity.  Plaintiffs now struggle to control their anxiety around El Paso police officers.  This happened to them once.  What is to prevent it from happening again?

**D. Despite officers engaged in unlawful and violative conduct that violated Plaintiffs' rights and caused them harm; Defendant City and its Chief stood by its officers with discretionary and inadequate investigation.**

75.    Defendant Gonzalez did not have any non-retaliatory purpose for arresting Plaintiffs.  Ms. Ordonez was simply standing around a concerned family member, recording her relative's statement, when Defendant Gonzalez noticed what she was doing.  Defendant Gonzalez did not threaten arrest until Plaintiff Ordonez declined to stop filming and began verbally criticizing her.

76.    Defendant Pineda did not intervene or stop Defendant Gonzalez. Instead, he joined Defendant Gonzalez in chasing the terrified teenage girls to their home, before bodily trying to prevent one from entering her house.

77.    Defendant Officers did not leave to obtain a warrant, nor did they have other officers bring them a warrant.  They had ample time to obtain a warrant if they

had probable cause to enter, but they did not do that.  Nor were there exigent circumstances which authorized them to enter without one.

78.    Defendants  Gallardo,  Jurado,  Campa,  and  Hernandez  joined Defendants Gonzalez and Pineda in invading Plaintiffs' private property—without a warrant—before forcefully arresting Plaintiffs, causing injuries.

79.    Defendant John Doe, after arriving on scene and being briefed by Defendant Officers, did not intervene or stop Defendant Officers.

80.    Plaintiffs were detained for ten to twelve hours at the substation without food, water, or medical care before Defendant Officers finally relented and released them to the jail where they were processed and released on bond.

81.    Defendant City's Officers at the substation did not intervene or stop Defendant Officers from detaining Plaintiffs so cruelly.

82.    Defendant Officers submitted multiple charges against both Plaintiffs knowing they had no just cause for any of the arrests or charges.

83.    Defendant  City's  Supervisory  Officers  did  not  intervene  or  stop Defendant Officers from doing so.

84.    Following  these  incidents,  Plaintiff's  previous  criminal  defense attorneys submitted complaints about the officers' actions to internal affairs, the FBI, and the Texas Rangers.  The FBI reached out requesting interviews and copies of the videos.  Plaintiff's attorneys provided the video, but declined to have his clients

provide interviews until the criminal charges were dismissed.

85.    He also met with EPPD internal affairs officers Lieutenant John Lanahan, Sergeant Mike Valles, Sergeant Octavio Jauregui, Sergeant Falisha Milner, and Detective Heraclio Herrera, with Texas Ranger Juan Torres present. Plaintiffs' criminal defense attorneys showed these officers the footage from the incident and explained the situation.  The officers were reluctant to provide any meaningful information and informed the attorneys that they would be on a short timeline to take administrative action.  Plaintiffs have never heard the results of this internal affairs investigation.

86.    Following these reports, Mr. Holguin noticed EPPD officers driving past homes in his neighborhood, including his house, shining a searchlight into the homes.  He informed his criminal defense attorneys of the matter and provided them a video.  While at his residence to speak with Mr. Holguin about his case, these attorneys witnessed this action firsthand.  The attorneys were then stopped by two officers, a sergeant and a lieutenant.  These attorneys recorded their conversation with these officers.  When they inquired about the patrol officers' actions, they noted uncomfortable body language from the two supervisors.   These attorneys subsequently provided these videos to the FBI agent in charge of the investigation, along with an account of what happened.

87.    Plaintiffs have also not heard back from the FBI or the Texas Rangers on their complaints.

### E. El Paso Policies, Practices, and Custom

88.    In Texas, it is not a crime to interfere with public duties by speech alone. Tex. Penal Code § 38.15(d).  Making speech a crime violates the First Amendment, and as noted by the United States Supreme Court, is what distinguishes a free nation from a police state.[5]

89.    However, in El Paso, its Policymakers passed an ordinance that prohibits anyone from "interfering" with police officers "by words, sounds, or acts"—even though words and certain acts (such as filming police performing their public duties) are protected by the First Amendment.

| 10.04.040 - Police officers—Obstructing prohibited. |
| --- |
| No person shall, whether by words, sounds, or acts, hinder, obstruct or impede, or attempt to hinder, obstruct or impede, any police officer of the city in the performance of any official duty of such officer, other than the making of an arrest or the service of process.<br>(Prior code § 15-30) |

90.    El Paso police officers are known for going after children and adults that film or verbally criticize them.  El Paso and its Policymakers are aware of

---

[5] "The freedom of individuals . . . to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state."  City of Houston, Tex. V. Hill, 482 U.S. 451, 462-63 (1987).

complaints, concerns, and even litigation contesting these issues, but the City and its Policymakers refuse to make any changes. There are enough instances in place—to include formal policies (such as the ordinance) to put the City on notice that its police officers—who are expected to interact with the public daily—would be in situations where members of the public using words and other First Amendment "acts" toward them is likely.

91.    On July 5, 2018, for instance, almost three years before this incident here, El Paso Police Officers Jose Rivas and Christian Sandoval detained a group of children celebrating a birthday at a local recreational center. Officer Rivas, an officer with a history of violently attacking a minor,[6] drew his service weapon and pointed it at the group of children verbally criticizing him. He later also drew his baton on the children. A teenage boy filmed the incident. When Officer Rivas saw the boy filming him, he had him arrested. Prior to his arrest, the teenage boy passed his phone to his mother to continue recording the scene. Officer Rivas also attempted to take the recording cell phone from the boy's mother, but she ran away from him to preserve the recording of the events. When he could not take the phone from her, he pushed the boy's mother three to four times, causing her to fall on a child. The teenage boy who started the recording was incarcerated for a week and

---

[6] Complaint and Demand for Jury Trial, *E.R. v. Jasso,* No. 3:18-CV-00298 (W.D. Tex. 10/09/2018), ECF No. 1.

falsely charged; these charges were later dismissed.[7]

92.    While Officer Rivas was placed on desk duty during the internal affairs investigation—despite his prior history of violent behavior toward a child and his clear retaliation against two citizens expressing their First Amendment rights—the Disciplinary Review Board unanimously exonerated him, and Officer Rivas returned to working at the El Paso Police Department.

93.    Despite complaints and lawsuits of similar conduct (such as with Officer Rivas)—which undoubtedly brought these matters to the attention of City of El Paso Policymakers back in 2018, policymakers still have not corrected their unconstitutional policies, practice, and custom regarding a citizen's First Amendment right to use words and to film their officers.  Policymakers also continue to have policies, practice, and custom in protecting their officers from public complaint through their discretionary internal investigation processes that allow Policymakers subjective control over what gets investigated and what does not.

94.    The publicly available El Paso Police Department Procedures Manual defines a department known as the Public Information Office (PIO).  This El Paso Police Department office is guided by a policy that "strives to define the balance between permitting the free flow of information to the public and the media, while

---

[7] Complaint and Demand for Jury Trial, *Flores v. Rivas,* No. 3:18-CV-00297 (W.D. Tex. 10/09/2018), ECF No. 1.

protecting both the prosecution's case and the rights of the accused from possible prejudicial publicity." Per Section 343.1, this office reports directly to *the Chief of Police*. Section 343.11 further explains the purpose of this seemingly innocuous office: "[a]ll filming . . . of on-duty personnel must have prior approval from the Public Information Office." This policy teaches El Paso Police Officers—counter to established law—that they cannot just be filmed by any person in a public area. Individuals wanting to film them must request and receive permission from a department that answers directly to the Chief of Police before pointing their cameras in those officers' direction. Otherwise, these individuals are violating the city ordinance criminalizing First Amendment activity.

95.    El Paso Police Officers, like Officer Rivas and Defendant Gonzalez, are also taught by department policies—and by history and experience—that they do not need to worry about internal affairs investigations. Per the Internal Affairs Division Operations Manual, Sections 2.2(A)(4) and 2.2(A)(5), "[c]omplaints likely to result in criticism of the Department" and "[u]nusual complaints likely to be closely scrutinized" *must be brought to the attention of the Chief of Police*; further, according to Section 2.2(E), "IAD will investigate cases as delineated in the Procedures Manual *or as directed by the Chief of Police*" (emphasis added).

96.    Following internal investigations, per the El Paso Police Department Procedures Manual, Sections 903.1 and 903.2, "the Department has established a

Disciplinary Matrix and Penalty Table . . . to determine the appropriate level of discipline," but "[t]he *Chief of Police* retains the right to depart from these guidelines" and "the right to modify or amend this matrix as needed without advanced notice."  He also "retains the right to apply Educational Based Discipline (E.B.D.) as he deems necessary."

97.    The Chief of Police, who has control over all media representations of the department and control over who gets permission to film police, also has control over the entire internal affairs investigation process, from initial complaint to final decision on discipline—without regard to any established procedure.

98.    So how can the Police Chief ever conclude that a police officer, that arrested an "unauthorized" individual from filming police, was ever in the wrong? He cannot, and he has not.

99.    Whatever the results of the investigation, per the Internal Affairs Division Operations Manual, Section 3.1(F), "The Internal Affairs Commander shall notify the complainant in writing of the results of the investigation and final disposition."  However, per Section 1.2(A)(1), "[t]he Internal Affairs Division Commander *reports directly to the Chief of Police*."

100.    Plaintiffs have never received final notice of the complaints they made against the officers that attacked them.  Nor have they been informed that any disciplinary action was taken against the officers who so fully invaded their lives

and their homes—over a teenage girl filming her minor relative giving a statement.

101.  It is likely the City of El Paso completely disregarded Plaintiffs' complaints.  Plaintiffs utilized an attorney to file the complaints with El Paso Police Department's internal affairs division.  The manual gives officers discretion to ignore these complaints since they were not signed by Plaintiffs, but by their attorney.

102. El Paso policies, practice, and custom allowed its deliberate indifference toward Plaintiff Ordonez's First Amendment right to verbally oppose police and to film them.

103. El Paso policies, practices, and custom establishes deliberate indifference by authorizing officers to unlawfully seize (detain and arrest) Plaintiffs in direct response to Plaintiff Ordonez engaging in protected conduct when she verbally opposed police and filmed them.

104. El Paso policies, practices, and custom establishes deliberate indifference by allowing its Police Chief and officers to completely disregard Plaintiff's complaints made in direct response to Plaintiff Ordonez engaging in protected conduct when she verbally opposed police and filmed them.

105. El Paso policies, practices, and custom establishes deliberate indifference to Plaintiffs' rights under the First Amendment as the City criminalizes First Amendment activity and encourages police to violate Plaintiffs' clearly

established rights under the First and Fourth Amendments of the United States Constitution.

106.   The City of El Paso, its Policymakers, and its officers knew or should have known that Plaintiffs have a First Amendment right to film police and to verbally oppose their conduct.  However, due to the City of El Paso's inadequate training policies, Defendant Officers were encouraged, and thought it was okay, to violate Plaintiffs' constitutional rights.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983
### (First Amendment – Unlawfully Preventing Recording of a Police Officer)

107.   Plaintiffs restate and incorporate by reference each and every allegation set forth in all prior paragraphs.

108.   Plaintiff Ordonez asserts this claim against Defendant Gonzalez.

109.   Defendant Gonzalez, at all relevant times, acted under the color of state law.

110.  Ms. Ordonez engaged in constitutionally protected conduct of recording police officers while they were performing their duties.

111.   Defendant Gonzalez did not have any issues with Ms. Ordonez or her sister standing on her driveway while the relative's statement was taken.  It was only when Gonzalez realized that Ms. Ordonez was filming that she had a problem.

112.    Defendant Gonzalez informed Plaintiff that if she did not stop recording that her phone would be seized.  Defendant Gonzalez did not demand Plaintiff to go inside the home, to back up to the street, or to leave.  She simply demanded that Plaintiff stop recording.

113.    When Plaintiff declined Defendant Gonzalez's demand, the officer grabbed the phone and threw it onto the ground.

114.    Defendant Gonzalez did not have any warrant or excuse for seizing Plaintiff's phone.

115.    Defendant Gonzalez's action intentionally impeded with Plaintiff Ordonez's constitutional right to film the police.

116.    Defendant Gonzalez's acts deprived Ms. Ordonez of the rights, privileges, and immunities guaranteed to citizens of the United States by the First and Fourteenth Amendments to the Constitution of the United States, and in violation of 42 U.S.C. § 1983.

117.    As a proximate cause of the illegal and unconstitutional acts of Defendant Gonzalez, Ms. Ordonez was harmed and suffered damages.  In the alternative, Plaintiff seeks nominal damages under this count.

## COUNT II
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983
### (First Amendment – Retaliation)

118.    Plaintiffs restate and incorporate by reference each and every allegation

set forth in all prior paragraphs.

119.    Plaintiff Ordonez asserts this claim against Defendants Gonzalez and Pineda.

120.    Ms. Ordonez was engaged in constitutionally protected conduct of recording the police and then engaged in verbally criticizing police for their unlawful conduct of stopping her from recording by seizing her phone.

121.    Defendants Gonzalez and Pineda, in accordance with the policies of El Paso, seized Plaintiff for exercising her First Amendment rights to record and criticize the police.

122.    In retaliation for this protected conduct, Defendant Gonzalez intentionally, knowingly, maliciously, recklessly, and/or unreasonably assaulted Ms. Ordonez by slapping her phone out of her hand.

123.    Defendants Gonzalez and Pineda retaliated against Plaintiff by following her into her father's home, and then detained, handcuffed, and arrested her without a warrant, probable cause, or any legal basis.

124.    Defendant Gonzalez then retaliated against Plaintiff Ordonez by slamming her head into the ground.

125.    Defendants had no knowledge of any facts or circumstances which would lead a reasonable person to believe that Ms. Ordonez committed any offense that justified Defendants' conduct.

126.   Such a retaliation would serve as a deterrent to a person of ordinary firmness from engaging in such protected conduct.

127.   The retaliation was motivated at least in part by the protected speech.

128.   There is a causal connection between Ms. Ordonez's constitutionally protected conduct and the adverse retaliatory actions taken by the Defendants.

129.   The law is clearly established that individuals have a First Amendment right to record the police.

130.   In response to Defendant Gonzalez grabbing Ms. Ordonez's phone and throwing it on the ground, Plaintiff Ordonez began asking Defendant Gonzalez why she engaged in that conduct.

131.   To cease Plaintiff's protected conduct of verbally criticizing the police, Defendants Gonzalez and Pineda went to seize Ms. Ordonez despite lacking any reasonable suspicion or probable cause to do so.

132.   Defendants' unlawful conduct scared Ms. Ordonez and forced her to follow her father to his home to avoid further unmeasured and unreasonable escalation from the Defendant Officers.

133.   It is clearly established that it is a First Amendment violation if an officer retaliates against someone in response to protected speech. *Mesa v. Prejean*, 543 F.3d 264, 273 (5th Cir. 2008) (citing *Lewis v. City of New Orleans*, 415 U.S. 130, 134-35, (1974) (Powell, J., concurring)) ("Trained officers must exercise

restraint when confronted with a citizen's anger over police action."); *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002) ("The First Amendment prohibits . . . adverse governmental action against an individual in retaliation for the exercise of protected speech activities."); *see Hill.*, 482 U.S. at 462 ("[The] First Amendment protects a significant amount of verbal criticism and challenge directed at police officers."). Defendants Gonzalez and Pineda violated this right.

134. Defendants Gonzalez and Pineda then rounded up other El Paso police officers to make entry into Mr. Holguin's home. Once inside, Defendants arrested, or caused the arrest, of both Plaintiffs.

135. At all times relevant, Defendants Gonzalez and Pineda were acting under color of State law.

136. Defendants Gonzalez and Pineda arrested, or caused the arrest of, Plaintiff Ordonez without reasonable suspicion, probable cause, or any lawful basis. Defendants caused unreasonable and unnecessary forced to be used against Plaintiff Ordonez for no lawful reason.

137. Defendant Officers would not have detained, arrested, or assaulted Plaintiff Ordonez had she not been recording her relative giving her statement to Defendants Gonzalez and Pineda, and had she not verbally criticized the police after Defendant Gonzalez seized her phone.

138.   Defendant Officers would not have detained, arrested, or assaulted Plaintiff Holguin had he not tried to protect his daughter from being arrested for recording police officers—an unlawful arrest.

139.   Defendant Gonzalez's decision to threaten and secure the arrests of Plaintiff Ordonez was made in retaliation to Plaintiff Ordonez filming Defendant Officers while recording her family member's statement.

140.   Defendants' acts deprived Ms. Ordonez of the rights, privileges, and immunities guaranteed to citizens of the United States by the First, Fourth, and Fourteenth Amendments to the Constitution of the United States, and in violation of 42 U.S.C. § 1983.

141.   As a direct and proximate result of Defendants Gonzalez and Pineda's unlawful actions, Plaintiffs were harmed and suffered damages as a result.

## COUNT III
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983
### (First Amendment – Retaliation)

142.   Plaintiffs restate and incorporate by reference each and every allegation set forth in all prior paragraphs.

143.   Plaintiffs assert this claim against all Defendants (to include John Doe).

144.   Plaintiffs were engaged in constitutionally protected conduct of filing complaints with internal affairs.

145.   In response, Policymakers for the City of El Paso directed (or ratified

the conduct) of officers driving by Plaintiffs' residence numerous times a day over several weeks and months, observing them, shining lights into their homes, with the purpose of intimidating them and chilling Plaintiffs' First Amendment activity.

146.  Defendants intentionally, knowingly, maliciously, recklessly, and/or unreasonably intimidating Plaintiffs in direct response to Plaintiff Holguin making complaints to internal affairs.

147.  As a direct and proximate result of Defendants Gonzalez and Pineda's unlawful actions, Plaintiffs were harmed and suffered damages as a result.  In the alternative, Plaintiffs are entitled to nominal damages.

### COUNT IV
### VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983
### (Fourth Amendment – Illegal Entry)

148.  Plaintiffs restate and incorporate by reference each and every allegation set forth in all prior paragraphs.

149.  Plaintiffs assert this claim against Defendants Gonzalez, Pineda, Gallardo, Jurado, Campa, and Hernandez.

150.  It is clearly established that warrantless entry into a home is unconstitutional. *Collins v. Virginia*, 138 S. Ct. 1663, 1670 (2018) ("[T]he Fourth Amendment's protection of curtilage has long been black letter law.").  The Fifth Circuit has held that, "[u]nder the Fourth Amendment, a warrantless intrusion into a person's home is 'presumptively unreasonable unless the person consents, or unless

probable cause and exigent circumstances justify the intrusion." *Rockwell v. Brown*, 664 F.3d 985, 994-96 (5th Cir. 2011) (analyzing a warrantless entry claim separately from a warrantless arrest claim).  Defendants violated this right.

151.   Defendants did not have a warrant, exigent circumstances, or consent to cross over Plaintiffs' fence into their back yard.  Defendants would have known that a warrantless entry into a private dwelling without exigent circumstances, consent, or a warrant is unlawful, so the entry into Plaintiffs' fenced yard was unlawful.

152.   The only reason for Defendants' conduct was because Plaintiffs were engaged in protected activity.

153.   At all times relevant, Defendants Gonzalez, Pineda, Gallardo, Jurado, Campa, and Hernandez were acting under color of State law.

154.   Defendants did not report that there was an ongoing crime occurring, or that people were injured.  Defendants did not have exigent circumstances to make entry into Plaintiffs' dwelling.  Defendants had time to secure a warrant, but they did not do so.

155.   Defendants Gonzalez, Pineda, Gallardo, Jurado, Campa, and Hernandez offended the Constitution by making entry into Plaintiffs' home without any lawful basis.

156.   Defendants  Gonzalez,  Pineda,  Gallardo,  Jurado,  Campa,  and Hernandez acted intentionally, knowingly, maliciously, reckless, unreasonably, and with gross negligence.

157.   As a direct and proximate result of these Defendants' unlawful actions, Plaintiffs were harmed.

**COUNT V**
**VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983**
**(Fourth Amendment – Unlawful Seizure)**

158.   Plaintiffs repeat, reiterate, and re-allege each and every allegation set forth above and incorporate them as if fully set forth herein.

159.   Plaintiffs  assert  this  claim  against  Defendants  Gonzalez,  Pineda, Gallardo, Jurado, Campa, and Hernandez.

160.   A seizure occurs when an officer, by means of physical force or show of  authority,  intentionally  restrains  a  person's  freedom  of  movement  so  that  a reasonable,  innocent  person  would  have  believed  that  she  was  not  free  to  leave, terminate the encounter, or decline the officer's request.

161.   Plaintiffs  have  a  clearly  established  right  to  be  free  from  unlawful seizure.  *Freeman v. Gore*, 483 F.3d 404, 411-13 (5th Cir. 2007).  The Fifth Circuit has previously acknowledged that removing a plaintiff from her doorway, and then placing her in handcuffs for 30 to 45 minutes constitutes an unlawful arrest in violation of the Fourth Amendment.  *Id*.  Defendants violated this right.

162.    Defendants Gonzalez, Pineda, Gallardo, Jurado, Campa, and Hernandez, at all relevant times, acted under the color of law.

163.    Defendant Gonzalez unlawfully seized Plaintiff Ordonez when she asserted control over her by demanding that she not record under the threat of arrest and seizure.

164.    Defendant Officers then unlawfully seized Plaintiffs in their home.

165.    Defendants seized Plaintiffs with physical force, threats, and unlawful show of authority.

166.    If the seizures rose to an arrest, it was without probable cause.  "[A] seizure without probable cause to believe the person is guilty of a crime violates the Fourth Amendment." *United States v. Massi*, 761 F.3d 512, 523 (5th Cir. 2014).

167.    If the seizures constituted a *Terry*-style detention, it was still in violation of the Fourth Amendment as the detention is supposed to be based on "reasonable suspicion that criminal activity is afoot." *Caroll v. Ellington*, 800 F.3d 154, 169 (5th Cir. 2015).  But Defendants detained Plaintiffs because Plaintiff Ordonez filmed the police interaction from the driveway of where she was residing. No reasonable officer could think that Plaintiffs were associated with any criminal activity.

168.    Even if Defendants did not arrest or detain Plaintiffs, they still violated the Fourth Amendment.  An "investigatory, suspicionless seizure trigger[s] a Fourth

Amendment reasonableness analysis." *Lincoln v. Scott*, 887 F.3d 190, 196 (5th Cir. 2018).

169.   Plaintiffs' seizures did not carry any public concern, did not advance any public interest, and was far more than a minimally intrusive stop authorized for suspicionless seizures. *Illinois v. Lidster*, 540 U.S. 419, 427-28 (2004).  Defendants seized Plaintiffs, applied body weight on them, handcuffed them, and took them to jail—all in response to Plaintiff Ordonez filming them.

170.   Regardless of the type of seizure, the seizure was apparent, and any reasonably trained officer would recognize that it violated Plaintiffs' First and Fourth Amendment rights.  Plaintiffs were not free to leave, and their movements were restrained "by means of . . . a show of authority." *United States v. Mendenhall*, 446 U.S. 544, 553 (1980).  This included the officers' use of physical force and assertion of authority. *California v. Hodari D*, 499 U.S. 621, 626 (1991).

171. Defendants Gonzalez, Pineda, Gallardo, Jurado, Campa, and Hernandez's conduct was done intentionally, knowingly, maliciously, reckless, unreasonably, and with gross negligence.

172.  As a direct and proximate result of Defendant Officers' unlawful actions, Plaintiffs suffered damages for her physical, mental, and emotional injury, and for pain, mental anguish, humiliation, embarrassment, and loss of reputation.

## COUNT VI
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983
### (Fourth Amendment – Unlawful Search)

173.   Plaintiffs repeat, reiterate, and re-allege each and every allegation set forth above and incorporate them as if fully set forth herein.

174.   Plaintiff Ordonez asserts this claim against Defendant Gonzalez.

175.   At all times relevant herein, Defendant was acting under the color of State law.

176.   It is well-established that police officers are not permitted to make a search incident to an unlawful arrest.  *See United States v. Hernandez*, 825 F.2d 846, 852 (5th Cir. 1987) (explaining that an arrest must be lawful for the search-incident-to-arrest exception to apply).

177.   Defendant Gonazlez had no lawful basis to deprive Plaintiff of her phone when she grabbed it and caused it to fall onto the ground and break.  Then, when Plaintiff retrieved it, Defendant Gonzalez caused Plaintiff to be seized so she could justify the unlawful search and seizure of Plaintiff's phone.

Plaintiff was harmed as a result of Defendant's unlawful seizure, and as a result, was harmed.

## COUNT VII
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983
### (Fourth Amendment – Excessive Force)

178.   Plaintiffs repeat, reiterate, and re-allege each and every allegation set

forth above and incorporate them as if fully set forth herein.

179.   Plaintiffs assert this claim against Defendants Gonzalez, Pineda, Gallardo, Jurado, Campa, and Hernandez.

180.   "The Fourth Amendment prohibits police from using more force than is reasonably necessary to effectuate an arrest." *Buehler v. Dear*, 27 F.4th 969, 980 (5th Cir. 2022).

181.   It is clearly established that Plaintiffs have the right under the Fourth Amendment to be free from excessive force during such a seizure. *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012) (citation omitted).

182.   Defendant Officers, while acting in the scope of their employment, and under the color of law, used greater force than necessary to effectuate a detention or arrest.

183.   Plaintiffs did not display any threatening or aggressive behavior to necessitate the use of any force.

184.   Plaintiffs had a clearly established, constitutional right to be free from excessive force.

185.   The Defendants' acts deprived Plaintiffs of their rights, privileges, and immunities guaranteed to citizens of the United States by the Fourth and Fourteenth Amendments to the Constitution of the United States, and in violation of 42 U.S.C. § 1983.

186.    Defendant Gonzalez used greater force than necessary when she slapped and grabbed Ms. Ordonez to knock her phone out of her hand.

187.    One or more Defendant Officers used greater force than necessary when they piled on Ms. Ordonez (who weighs 110 pounds) causing her difficulty in breathing and caused her imminent harm.

188.    Defendant Gonzalez used greater force than necessary when she grabbed Ms. Ordonez's head, after she was handcuffed, and slammed it into the ground.

189.    One or more Defendants used greater force than necessary when they kicked and tackled Mr. Holguin to the ground with his back turned after they jumped his fence.  Mr. Holguin was not resisting, but the officers attempted to justify their force by claiming he was.

190.    Defendant Gonzalez used greater force than necessary when she slammed Mr. Holguin's shoulder into the door several times.  Defendant Gonzalez used this force against Mr. Holguin even though he was handcuffed and not actively resisting or fleeing.

191.    One or more Defendants used greater force than necessary when they purposefully tightened handcuffs on Mr. Holguin and leaving them tightened for several hours causing ligament and nerve damage.

192.   If the officers did not intend to arrest Plaintiffs, then they were without any basis to use force on them.  There was no crime, they did not pose any immediate threat to the safety of officers or others, and they were not actively resisting or attempting to evade lawful arrest.  *See Joseph v. Bartlett*, 981 F.3d 319, 332 (5th Cir. 2020).

193.   Defendant Officers used this force against Plaintiffs even though they were not actively resisting.  It has long been established that "[o]fficers engage in excessive force when they physically strike a suspect who is not resisting."  *Id*. at 342.

194.   It is objectively unreasonable "for an officer to use injurious force against a non-resisting, non-dangerous individual who is not suspected of a serious crime"—especially when "force is applied after the suspect has been restrained and subdued."  *Aguirre v. City of San Antonio*, 995 F.3d 395, 412 (5th Cir. 2021).  *See also Timpa v. Dillard*, 20 F.4th 1020, 1038 (5th Cir. 2021) (recognizing that . . . once a suspect has been handcuffed and subdued . . . an officer's subsequent use of force is excessive"); *Carroll v. Ellington*, 800 F.3d 154, 177 (5th Cir. 2015) ("The law was clearly established at the time of the deputies' conduct that, once a suspect has been handcuffed and subdued, and is no longer resisting, and officer's subsequent use of force is excessive." (citing *Bush v. Strain*, 513 F.3d 492, 501-02 (5th Cir. 2008)).  Defendant Officers violated this right.

195. The force used by Defendants Gonzalez, Pineda, Gallardo, Jurado, Campa, and Hernandez was objectively unnecessary, excessive, and unreasonable under the circumstances. Rather, Defendants Gonzalez, Pineda, Gallardo, Jurado, Campa, and Hernandez embarked on a willful, malicious, reckless, and outrageous course of conduct that was intended to cause—and in fact caused—Plaintiffs to suffer.

196. Defendants knew their force was excessive but did it anyway.

197. As a direct and proximate result of Defendants Gonzalez, Pineda, Gallardo, Jurado, Campa, and Hernandez's unlawful conduct, Plaintiffs suffered damages for their physical, mental, and emotional injury, and for pain, mental anguish, humiliation, embarrassment, and loss of reputation.

198. Defendants knew their force was excessive but did it anyway.

## COUNT VIII
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983
### (First Amendment – Prior Restraint)

199. Plaintiffs repeat, reiterate, and re-allege each and every allegation set forth above and incorporate them as if fully set forth herein.

200. This cause of action is against Defendant Gonzalez and the City of El Paso. The City of El Paso only authorizes the filming of police officers if permission is obtained from the PIO department managed by the Chief of Police.

201. Pursuant to this policy, Defendant Gonzalez demanded that Plaintiff

Ordonez stop recording while on her driveway, or risk having her phone taken from her (despite the lack of consent, warrant, or exigent circumstances).  When Plaintiff continued recording, Defendant Gonzalez demanded that Plaintiff leave her own property.  When Plaintiff continued recording, Defendant Gonzalez slapped Plaintiff Ordonez and her phone to seize it and to punish Ms. Ordonez.

202.    Defendant Gonzalez and other Defendant Officers are trained by the City of El Paso that they cannot be recorded unless the Chief of Police authorizes it, and any other recording of them is construed as obstruction.  Police officers are further trained that anyone that speaks to them or films them is interfering with them in violation of city ordinance.

203.    This constitutes a prior restraint.  "Regulations that require speakers to obtain permits before speaking" are known as "prior restraints."  *Serv. Emps. Int'l Union, Loc. 5 v. City of Houston*, 595 F.3d 588, 596 (5th Cir. 2010).  Prior restraints "are disfavored and must be confined by 'narrow, objective, and definite standards.'" *Id*. (quoting *Shuttlesworth v. City of Birmingham, Ala*., 394 U.S. 147, 150-51 (1969)).

204.    First, the policies dictating the a requirement to get permission prior to filming are inconsistent with Plaintiffs' First Amendment rights recognized by *Turner v. Driver*.  Second, the Chief of Police has complete discretion as to when to grant permission.  There is not any standard process.  It also does not matter that

Plaintiff was in her own driveway.

**COUNT IV**
**VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983**
**(*Monell* Liability)**

205.   Plaintiffs repeat, reiterate, and re-allege each and every allegation set forth above and incorporate them as if fully set forth herein.

**A. The City of El Paso's policies, practices, and custom that fail to recognize Plaintiffs' First Amendment rights constitute a moving force behind violating Plaintiffs' constitutional rights.**

206.   The City of El Paso is liable for all damages suffered by the Plaintiffs pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) and 42 U.S.C. § 1983, based on an official policy or custom of the City of El Paso police department, of which the City Council, the City Manager, the Mayor, and the Chief of Police all had actual or constructive knowledge that was a moving force behind the constitutional violates alleged herein.

207.   A municipal policy is "[a] policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority." *Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir. 1984) (per curiam). "[A] facially innocuous policy will support municipal liability if it was promulgated with deliberate indifference to the 'known or obvious consequences' that constitutional violations would result." *Piotrowski v. City of Houston*, 237 F.3d 567,

579 (5th Cir. 2001) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 407 (1997)).

208.   As described above, the City of El Paso has an ordinance that criminalizes words and acts—even those protected by the First Amendment.  The City of El Paso has policies and procedures that give the Chief of Police complete discretion in training, investigating, and disciplining officers.

209.   The City of El Paso trains its officers on local ordinance, compliant procedures, and permits required before they can be filmed.

210.   Defendants Gonzalez, Pineda, Gallardo, Jurado, Campa, and Hernandez were acting under the color of law and acting pursuant to customs, practices, and policies of the City of El Paso and the El Paso Police Department in regard to the use of force as authorized or ratified by the Policymakers—Chief of Police Greg Allen, City Manager Tommy Gonzalez, Mayor Oscar Leeser, and the El Paso City Council—when Defendants Gonzalez, Pineda, Gallardo, Jurado, Campa, and Hernandez deprived Plaintiff Ordonez of the rights and privileges secured to her by the First Amendment of the Constitution, before turning around and depriving Plaintiffs of the rights and privileges secured to them by the Fourth Amendment to the United States Constitution.  This was a direct result of the City of El Paso failing to provide proper training on citizens' right to film police officers, on the appropriate use of force, and on the limited exigent circumstances which

permit warrantless entry, which is a violation of 42 U.S.C. § 1983.

211.    Detaining and arresting individuals are part of a police officer's duties. Police officers are expected to interact with members of the public that film them and verbally oppose them. Policymakers know this. They are required to implement policies that require appropriate and measured responses while also protecting the rights of citizens. The policies, practices, and customs of the City of El Paso directly contradict these considerations.

212.    The Policymakers knew of these policies, practices, and customs but acted with deliberate indifference. These violations should have been apparent to the Policymakers.

213.    The City of El Paso's policies, practices, and custom were the moving force behind Plaintiffs' constitutional violations.

**B. The City of El Paso failed to train its officers on a citizen's First Amendment rights, use of force, lawful seizures, and lawful entries of private dwellings.**

214.    The City and its Policymakers failed to adequately train, supervise, and/or discipline its employees regarding the First Amendment rights of citizens to film and verbally criticize police, the appropriate use of force when citizens exercise their First Amendment rights, the reasons to effectuate an arrest or other seizure, and the limited exigent circumstances permitting warrantless entry of someone's home.

215.    "A municipality's failure to train its police officers can without question

give rise to § 1983 liability." *World Wide St. Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 756 (5th Cir. 2009).

216.   The failure to train, supervise, and/or discipline its employees in this manner reflects a deliberate indifference on the parts of the City of El Paso (including Councilmembers Peter Svarzbein, Alexsandra Annello, Cassandra Hernandez, Joe Molinar, Isabel Salcido, Claudia Lizette Rodriguez, Henry Rivera, and Cissy Lizarraga), the El Paso Police Department, Chief of Police Greg Allen, City Manager Tommy Gonzalez, and Mayor Oscar Leeser to the rights of the City's inhabitants and is actionable under 42 U.S.C. § 1983.

217.   Defendants' violations of Plaintiffs' rights were obvious and a highly predictable consequence of insufficient training.

218.   While the City of El Paso knew based on a pattern of conduct of its officers in targeting individuals that film them, it also should have known that these interactions were likely given the permit requirements before filming is allowed, and the fact that the City criminalizes a person's words and other acts (such as filming police).

219.   Even without the pattern and knowledge of the City, this single incident is sufficient to show deliberate indifference on part of the City and its Policymakers because these facts that led to the violations are such that it should have been apparent to the City these constitutional violations were the highly predictable

consequence of a particular policy or failure to train. *Burge v. St. Tammany Parish*, 3369 F.3d 363, 373 (5th Cir. 2003) citing *Brown v. Bryan County*, 219 F.3d 450, 461 (5th Cir. 2000).

220.    The City and its Policymakers "know to a moral certainty that their police officers" are required to conduct certain functions, such as make arrests and secure arrest warrants. *See, e.g.*, *City of Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989).

221.    The most basic function of conducting arrests or applying for arrest warrants, as well as using force, is to know the constitutional limits of each. Without this knowledge, no officer could be expected to know how to make lawful arrests or how to deploy reasonable force.

222.    However, not a single officer questioned Defendant Gonzalez's basis for arresting Plaintiffs, and not a single officer protested making entry onto Plaintiffs' property to conduct those arrests. A reasonably trained officer would have recognized the arrests were unlawful and the intrusion into Plaintiffs' home was without consent, a warrant, or even exigent circumstances. Instead, Defendant Officers accepted Defendant Gonzalez's plans to break into Plaintiffs' home and arrest them, so she could secure Ms. Ordonez's phone and send a message that exercising her First Amendment rights would not be tolerated.

223.    A reasonably trained officer would have recognized Plaintiff Ordonez's right to film the officers while they took her relative's statement.  A reasonably trained officer would have recognized they needed an arrest warrant to enter Plaintiffs' property and that a judge would never grant them one given the basis for the charge.  They would not have threatened arrest or arrested Plaintiff Ordonez for exercising her First Amendment right.  They would not have arrested Plaintiffs Ordonez and Holguin after making warrantless entry into their back yard.

224.    There is a casual connection between the failure to train and the violation of Plaintiffs' rights.  Had Defendant Officers been properly trained as to Plaintiffs' rights they would have never attempted to stop Ms. Ordonez from filming, or retaliate against her through assault, illegal entry, and arrest of her and her father. Every officer present at Plaintiffs' residence on April 18, 2021, acted contrary to how a reasonably trained officer would have acted in similar circumstances.

225.    There is a constitutional duty to not interfere with Plaintiff's right to be free from excessive force and unreasonable searches and seizures that are likely to arise "in recurrent situations that a particular employee is certain to face." *Littell v. Houston Indep. Sch. Dist.*, 894 F.3d 616, 626 (5th Cir. 2018).

226.    Defendant City's failure to properly train its police officers, through an adequate training program, regarding First Amendment rights to film and verbally criticize police, lawful arrests, lawful entry into private dwellings, and the use of

force was the proximate cause of the violations of Plaintiffs' constitutional rights.

**C. The City of El Paso failed to adequately supervise or discipline its officers for excessive force, unlawful arrests, and failing to intervene, and in failing to do so, ratified and encouraged the conduct of its officers.**

227.    The City of El Paso is liable for failing to supervise and discipline its officers for prior and current violations and the resulting lack of supervision:

(a)    The City and Police Chief failed to adequately supervise or discipline its employees in handling usual and recurring situations with which they deal;

(b)    Chief Allen and City Manager Gonzalez were deliberately indifferent to the need to supervise or discipline its officers or employees adequately;

(c)    The failure to adequately supervise and discipline its officers proximately caused the deprivation of Plaintiffs' constitutional rights; and

(d)    The City and its Policymakers failed to adequately supervise or discipline Defendant Officers for stopping Plaintiff from recording, and then retaliating against her for exercising her First Amendment rights to record and verbally criticize the government.

228.    Despite having knowledge of Defendant Officers' violations of the El Paso Police Department's use of force policies, and other best police practices, Defendant City and its Policymakers refused to adequately discipline Defendant Officers.  The City's Policymakers were aware of the out-of-control behavior of Defendant Gonzalez and other Defendant Officers but failed to take any action.

229.    Instead, the City of El Paso allowed the Police Chief and his officers to exercise discretion in even evaluating a complaint where officers fulfill City policies, practices, and custom that prohibit and criminalize the recording and verbal criticism

of on-duty police officers (without a PIO permit).

230.   Defendant City's failure to adequately supervise or discipline its officers was therefore the moving force behind Plaintiffs' damages.

231.   Defendant City's failure to investigate was a deliberate indifference of the conduct of the involved officers, and this failure was the proximate cause of the violations of Plaintiffs' constitutional rights.

**D. The City of El Paso failed to adequately investigate, and in failing to do so, ratified and encouraged the conduct of its officers, including Defendant Gonzalez.**

232.   In addition, Defendant City, as applicable, failed and refused to adequately investigate Defendant Officers' conduct.   Instead, Defendants were alerted to the investigation and were permitted (or instructed) to intimidate Plaintiffs over the course of several months.   In addition, the City's policies, practice, and custom give its Chief of Police discretion to accept or reject any complaint for any reason.   The IAD policies also allow officers to reject complaints if they are not in writing and signed directly by the Plaintiffs.

233.   Plaintiffs were never informed that their complaint was not accepted. They were not informed of anything at all.   Instead, following the making of the complaint, they suffered months of intimidation as different police officers continuously drove by their home, shone lights into it, and questioned anybody that went to the home (to include two of their attorneys).

234.    The City and its Policymakers knew that as a direct consequence of giving broad discretion to officers and the Chief of Police as to what complaints to accept, and what complaints to actually investigate, that there would be no real accountability of its officers that violate constitutional rights.

235.    The City of El Paso, by giving discretion as to what is investigated, and how investigations occur, knew that Plaintiffs would be subject to retaliatory conduct that violates their First and Fourth Amendment rights, and that their complaints would be swept under the rug, because the Defendant Officers protected City policy, practice, and custom that prohibits and criminalizes filming and verbal opposition toward uniformed police officers.

236.    Defendant City's failure to investigate, or decision to accept a complaint in the first place, constitutes deliberate indifference of the conduct of the involved officers, and this failure was the proximate cause of the violations of Plaintiffs' constitutional rights.

237.    Defendant City is directly responsible for the individual Defendants' conduct described herein.

**E. The City of El Paso falsely arrested Plaintiffs although Plaintiff Ordonez did not commit a penal offense.**

238.    Plaintiffs would show that the actions of Defendant Gonzalez were objectively unreasonable and done in bad faith in that it resulted in the wrongful arrest of Plaintiffs without probable cause, for no lawful reason.  Plaintiff Ordonez

did not commit a crime, was not accused of committing a crime, and was not even a suspect in committing a crime. Plaintiff simply refused to stop recording in response to Defendant Gonzalez's unlawful and unconstitutional order. Then, when Officer Gonzalez, for no objective reason, assaulted Plaintiff and her sister and tried to arrest them, Plaintiff Holguin moved to protect his daughters from these unlawful arrests and excessive force. Defendant Gonzalez decided to punish Plaintiff Holguin by—without any lawful purpose—ordering his arrest as well.

239. The only purpose for Defendant Gonzalez's actions was to block Plaintiff from filming the City's officers while they took her relative's statement.

240. Plaintiffs suffered damages because of her illegal search and seizure, and this arrest and search were done under the color of law.

## DAMAGES

241. **Actual damages**. Defendants' acts or omissions were a proximate cause and the moving force behind the following actual damages suffered by the Plaintiffs, and Defendants should be held jointly and severally liable for the physical injuries, mental anguish, emotional distress, loss of potential income, disfigurement, medical treatment, and pain and suffering.

242. **Punitive/Exemplary Damages against individual defendants in their individual capacities**. Punitive/exemplary damages are recoverable under Section 1983 when the conduct is shown to be motivated by evil motive or intent, or

when it involves reckless or callous indifference to the federally protected rights of others.

243.  **Nominal damages** for First Amendment violations.

244.  Prejudgment and post judgment interest.

245.  Costs of court.

246.  Reasonable and necessary attorney's fees incurred by the Plaintiffs through trial, and reasonable and necessary attorney fees that may be incurred by Plaintiffs for any post-trial proceedings, or appeal, interlocutory or otherwise, pursuant to 42 U.S.C. § 1988.

247.  Plaintiffs seek unliquidated damages in an amount that is within the jurisdictional limits of the court.

## JURY DEMAND

248.  Plaintiff hereby demands a trial by jury on all issues so triable, pursuant to Fed. R. Civ. P. 38(b).

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray that Defendants be cited to appear and answer herein; that upon final trial hereof Plaintiffs have and recover judgment from Defendants; actual and nominal damages, exemplary and punitive damages, pre-judgment interest at the legal rate; interest on the judgment at the legal rate; costs of court; attorney fees; and any other relief, both general and special, in law and equity,

to which Plaintiffs are justly entitled.

Respectfully submitted,

**GRABLE GRIMSHAW PLLC**

*/s/ Brandon J. Grable*
**BRANDON J. GRABLE**
Attorney-in-Charge
Texas State Bar No. 24086983
brandon@g2.law
1603 Babcock Road, Suite 280
San Antonio, Texas 78229
Telephone: (210) 963-5297
Facsimile: (210) 641-3332
**COUNSEL FOR PLAINTIFFS**