**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| **ADZARI ORDONEZ, et al.**, | § | |
| *Plaintiffs,* | § | |
| | § | |
| **vs.** | § | **CAUSE NO: 3:23-CV-00099-KC** |
| | § | |
| **OFFICER D. GONZALEZ, et al.**, | § | |
| *Defendants.* | § | |

**THIRD AMENDED COMPLAINT**

NOW COME Plaintiffs, **ADZARI ORDONEZ ("Ordonez")** and **EDUARDO HOLGUIN ("Holguin"),** by and through their attorney, Brandon J. Grable of Grable Grimshaw PLLC, complaining of Defendants, the **CITY OF EL PASO, OFFICER DAISY GONZALEZ, OFFICER CLAUDIA CAMPA, OFFICER CHRISTOPHER HERNANDEZ**, and **JOHN DOE OFFICERS,** and respectfully alleging as follows:

<u>**INTRODUCTION**</u>

1.      In this State, citizens have a First Amendment right to film police officers performing their duties.  In direct response to Ms. Ordonez exercising this right while in her driveway, she and her father, Mr. Holguin, were retaliated against, after El Paso police officers seized, assaulted, and arrested Plaintiffs after following them into their home.  This is because the City of El Paso criminalizes speech and the filming of its police officers (unless the individual filming has a discretionary

permit).  The City of El Paso stands behind its police officers that violate its citizens'
First Amendment rights through discretionary investigations and lack of discipline
and training procedures.

2.     Plaintiffs ADZARI ORDONEZ and EDUARDO HOLGUIN bring this
civil action for damages against THE CITY OF EL PASO (including the CITY
MANAGER and more specifically, the CITY OF EL PASO POLICE
DEPARTMENT ("EPPD") with its POLICE CHIEF) and City of El Paso police
officers DAISY GONZALEZ, CLAUDIA CAMPA, CHRISTOPHER
HERNANDEZ, and JOHN DOE OFFICERS for several constitutional violations
that Plaintiffs suffered.  These violations include the unlawful assault of Plaintiffs
by Defendant Officers Daisy Gonzalez, Claudia Campa, and Christopher Hernandez,
because Plaintiff Ordonez was filming the police at her main residence—a
constitutionally protected activity.  Plaintiffs Ordonez and Holguin bring this civil
action for damages against the City of El Paso and its police officers for violating
Plaintiffs' rights under the First and Fourth Amendments of the United States
Constitution and pursuant to 42 U.S.C. § 1983.

3.     Plaintiffs allege that the CITY OF EL PASO and its policymakers, City
Manager TOMMY GONZALEZ ("Gonzalez"), Chief of Police GREG ALLEN

("Allen"),[1] the El Paso CITY COUNCIL (Peter Svarzbein, Alexsandra Annello, Cassandra Hernandez, Joe Molinar, Isabel Salcido, Claudia Lizette Rodriguez, Henry Rivera, and Cissy Lizarraga)("Council"), and Mayor of El Paso, Oscar Leeser ("Leeser") (collectively referred herein as the "Policymakers") failed to properly train, supervise, screen, discipline, transfer, counsel or otherwise control officers who are known, or who should have been known, to engage in the use of excessive force against those engaged in constitutionally protected activity, including those officers repeatedly accused of such acts.  The Policymakers, specifically City Manager Gonzalez, along with Chief of Police Allen, had a duty, but failed to implement and enforce policies, practices, and procedures for the El Paso Police Department that respected Plaintiffs' constitutional rights. These incidents clearly violated Plaintiffs' rights afforded to them under the United States Constitution and Section 1983.  The city of El Paso's failure to train and supervise its officers on the constitutional rights of citizens was entirely predictable and these failures resulted in Plaintiffs being assaulted during their unlawful arrests, which caused them unwarranted physical pain and mental anguish.  Officer Jurado and Defendants Gonzalez, Campa, Hernandez, and John Doe Officer consciously disregarded the rights of Plaintiffs, knowing that the Policymakers would ratify and approve of their

---

[1] Police Chief Greg Allen passed away on January 17, 2023.  Former Assistant Police Chief Peter Pacillas is the current interim Chief of Police.

actions, which Chief Allen did by failing to investigate or properly discipline the actions of these police officers.

4.      Plaintiffs were harmed and seek answers and compensation for their damages in this lawsuit.

## <u>JURISDICTION AND VENUE</u>

5.      This is a civil rights action in which the Plaintiffs seek relief for the violations of their rights secured by 42 U.S.C. § 1983 and the First and Fourth Amendments.

6.      Jurisdiction of this Court is found upon 28 U.S.C. § 1331.

7.      Venue is properly laid in the Western District of Texas, El Paso Division under 28 U.S.C. § 1391(b)(2).

8.      The events that gave rise to this lawsuit took place at the residence of 8730 Winchester Rd., and 8736 Winchester Rd., both located in El Paso, El Paso County, Texas.

9.       Pursuant to 42 U.S.C. § 1983, and other applicable laws, the Court may award nominal, compensatory, and punitive damages, as well as equitable relief against all of the Defendants in their individual capacity, for the violations of Plaintiffs' constitutional rights and harm caused by their actions/inactions.

## PARTIES

10.     Plaintiff **ADZARI ORDONEZ** ("Plaintiff Ordonez") is a law-abiding citizen of the United States and a resident of the City of El Paso, County of El Paso, State of Texas.  She is Eduardo Holguin's daughter.

11.     Plaintiff **EDUARDO HOLGUIN** ("Plaintiff Holguin") is a law-abiding citizen of the United States and a resident of the City of El Paso, County of El Paso, State of Texas.  He is Adzari Ordonez's father.

12.     Defendant **CITY OF EL PASO** ("Defendant City") is a political subdivision of the State of Texas, acting under the color of state law, and is a person for the purposes of a 42 U.S.C. § 1983 action.  Defendant is responsible for the policies, practices, and procedures of its Police Department and individual officers. Defendant City is also responsible for the policies implemented, endorsed, and enforced by its Policymakers.

13.     Defendant **DAISY GONZALEZ** (Badge #3226) ("Defendant Gonzalez") was at all pertinent times a police officer employed by the City of El Paso and was at all pertinent times acting under color of state law in performance of her duties as an El Paso police officer.

14.     Defendant **CLAUDIA CAMPA** (Badge #3502) ("Defendant Campa") was at all pertinent times a police officer employed by the City of El Paso and was at all pertinent times acting under color of state law in performance of her duties as

an El Paso police officer.

15.     Defendant **CHRISTOPHER HERNANDEZ** (Badge #3273) ("Defendant Hernandez") was at all pertinent times a police officer employed by the City of El Paso and was at all pertinent times acting under color of state law in performance of his duties as an El Paso police officer.

16.     Defendant **JOHN DOE OFFICERS** ("Defendant John Doe(s)") were at all pertinent times police officers employed by the City of El Paso and were at all pertinent times acting under color of state law in performance of their duties as El Paso police officers.

17.     Each and all of the acts of Defendants alleged herein were committed by said Officers while acting within the scope of their employment with Defendant City, as law enforcement officers for the El Paso Police Department.

18.     Each and all of the acts of Defendants were committed by said Officers despite their knowledge that they were engaging in unlawful and unconstitutional acts.  Yet despite this knowledge, they did them anyway, knowingly, recklessly, intentionally, wantonly, callously, purposely, purposefully, sadistically, cruelly, deliberately, and with deliberate indifference, gross negligence, and reckless disregard.

## STATEMENT OF FACTS

19.     El Paso is a border town.  This far-west Texas town, the historical home of the Ysleta del Sur Pueblo tribe, Franciscan friars, Spanish refugees, U.S. Army officers, and old west gunfighters, has a history spanning over 400 years.  This population center, now divided by political lines, sprawls across New Mexico state lines in the form of various communities and cities, like, Sunland Park, New Mexico; and mirrors the metropolis of Ciudad Juárez, Chihuahua, Mexico, split by a border fence and the Rio Grande.  The result of these various influences is a colorful mix of cultures grounded by years of tradition.

20.     Plaintiff Eduardo Holguin's family has lived in this area for generations, long before current state lines or country borders divided the region. Mr. Holguin, himself, has resided his whole life—from a child to an adult with children of his own—in the same house, now passed down to him from his parents, in the Pueblos Viejos neighborhood of El Paso.

21.     These deep roots have also created a deep connection in Plaintiff Holguin and his family with the city of El Paso.  His son, Eddie Holguin, Jr., served on the El Paso City Council for nine years, and his daughter-in-law Iliana, is the current County Commissioner for Precinct 3.  Plaintiff, himself, has friends throughout the city, known from years of going to the same schools and the same community events.

22.     It could be understood, then, if Mr. Holguin planned to live his sunset years peacefully in the community he had always called home.

23.     Defendant Officers Daisy Gonzalez, Claudia Campa, and Christopher Hernandez robbed him—and his daughters—of that peace.

**A. Plaintiff Ordonez documents family violence statement**

24.     In the early afternoon of Sunday, April 18, 2021, at or around1:00 P.M., Ms. Ordonez was in the shower when a close female relative called her, sobbing.[2] The teenager had been a victim of family violence and needed emotional support.

25.     Ordonez's relative, who was distraught from the situation that had occurred, also requested that Ordonez film her giving her statement to the police. She feared being too upset to remember what she would say about the incident involving her father, she was concerned for her safety, and she wanted to avoid any discrepancies within her statement; she also wanted a record to help her remember and to show to her mother when she arrived home.

26.     Ms. Ordonez alerted her father (Plaintiff Holguin), and sister to the situation, and then, as soon as she could, hurried to join them in comforting her female relative at her home.

27.     Mr. Holguin's house is located two houses down from the residence of this relative and her family.  At the time, Ordonez stayed at this female relative's

_____

[2] This relative was underage during the incidents in question.  Plaintiffs seek to protect her identity.

house during the week and spent weekends at her father's house with her sister.  On the day in question—Sunday—Ms. Ordonez was staying at  Holguin's house.

28.     As a result of this geographical closeness, the family members gathered on the sidewalk outside the female minor's home, then stayed there while they waited for the El Paso police officers, who had already made scene, to exit their vehicle.  This was around 1:50 P.M.



29.     After El Paso police officers Gonzalez and Pineda joined the family on the sidewalk, Plaintiff Ordonez joined the group.

30.    The family and officers moved up by the front door of the house so the officers could discreetly take the minor's statement.  While the female relative spoke with Officer Pineda, a probationary officer under the supervision of Defendant Gonzalez, Ms. Ordonez filmed the conversation as   requested, standing at least 3-4 feet to the side of both Defendant Officers.  Her sister stood near her.  Confident that the situation was under control, Mr. Holguin left his daughters and the female minor with the officers and returned to his home.

31.    The police officers knew that Ms. Ordonez and her sister were present during their investigation.  Ms. Ordonez's presence was not at issue.

32.    As the relative began making her statement, Ms. Ordonez began filming.  After five or so minutes, Defendant Gonzalez noticed Plaintiff Ordonez recording the interaction on her phone.  Defendant Gonzalez informed Ms. Ordonez that "this is an investigation," before issuing an unlawful ultimatum: either turn off her camera, or the officer would seize her phone.  Again, it was not Ms. Ordonez's presence that was the issue—it was her filming the police interaction while standing on her driveway.

33.    Ms. Ordonez responded by asking Defendant Gonzalez for her name and badge number.  Defendant Gonzalez gestured to her visible name tag and badge and told Plaintiff Ordonez that she could read them.



34.    While Ms. Ordonez tried to read her name on the shiny silver badge, Defendant Gonzalez again threatened to take the phone.  Without waiting for a reply, Defendant Gonzalez advanced toward Plaintiff Ordonez and forcibly took her phone out of her hand and threw it on the ground, shattering Plaintiff Ordonez's phone screen and ending her recording.  Officer Pineda did not intervene.

35.    Upset by this atrocious behavior, Ms. Ordonez picked her phone back up and started recording again.  She informed Gonzalez and Pineda that her filming was her right.  Plaintiff Ordonez's protests that this activity was protected under the First Amendment were ignored.

36.     Ms. Ordonez's sister, with her hands up, moved into a position between Plaintiff and Gonzalez. Plaintiff Ordonez continued questioning Defendant Gonzalez's actions and again informed Defendant Officers that recording was within her rights.



37.     Officer Pineda, a rookie officer, told Ms. Ordonez she could record; she just needed to stand back. When Ms. Ordonez asked for his name and badge number, he told her he would give her that information in a minute. Ms. Ordonez also complained to him that there was no reason for Defendant Gonzalez to touch her or to get physical.

38.     Faced with verbal criticism from Ms. Ordonez and her sister, Defendant Gonzalez then, without lawful authority, demanded that they leave under threat of arrest for "interfering."

39.     Ms. Ordonez inquired how she was interfering as she stood a safe distance away, was on property where she had a right to be and was filming the interaction at the request of her relative making the report to police. Rather than



provide clarification, Defendant Gonzalez advanced toward the sisters in an aggressive manner while threatening them multiple times that she would arrest them for "interference" if they did not leave.  As Plaintiff Ordonez protested that there was no reason for Defendant Gonzalez to arrest her, Defendant Gonzalez grabbed her sister's wrist, attempting to arrest her.

40.    Plaintiff Ordonez's sister pulled her arms away, breaking Defendant Gonzalez's grip.  She informed the officer that she would not hit her, before ordering the officer not to touch her.

41.    As Defendant Gonzalez radioed dispatch for a supervisor, Mr. Holguin returned.  Both teenagers informed their father that the officer had assaulted them because Ms. Ordonez had been filming.  Plaintiff Holguin, knowing the law, informed his daughters that the officer could not arrest them for that.  Determining that it was not safe for his daughters to stay, he told them, "Let's go," and guided them in the direction of his house.



42.    Seeing them leave—as Defendant Gonzalez had previously demanded multiple times that they do—Defendant Gonzalez protested that both girls were now under arrest.  As Plaintiffs kept walking away, Defendant Gonzalez threatened to add an evading arrest charge to her unlawful arrest for interference.  The family

continued walking across their neighbor's driveway back toward their home.

43.    Officer Pineda abandoned Plaintiff's female relative that he had been assisting and joined Defendant Gonzalez in chasing Ms. Ordonez and her sister. Fearful of something worse than a potentially unlawful arrest happening, Ms. Ordonez and her sister started running.

 



44.    Following behind them, their father, Mr. Holguin, yelled at the girls to

get out of there and to lock the door.  As the girls tried to obey their father, Defendant

Officers grabbed Plaintiff's sister and started trying to pull her away from her home,

claiming she was under arrest.  Mr. Holguin rebuked the Defendant Officers, telling

them to leave the girls alone, because they were just children.  Ms. Ordonez grabbed

her sister by the arm and pulled her inside.  She then wrapped her arms around her

father's waist and pulled him inside as well.  Mr. Holguin held onto the door as his

daughter pulled him to safety, enabling him to shut the door, which he then locked.

Through the locked metal screen door, he again told the officers to leave and rebuked

them for messing with children.

45.     As the officers left, Mr. Holguin demanded to know what had

happened.   The girls explained that they had just been recording their female

relative's statement when the female officer, Defendant Gonzalez, started grabbing

and pushing them and took Plaintiff Ordonez's phone.

**B. Defendant Officers assault Plaintiffs**

46.     While Plaintiffs temporarily felt safe in their own home, it was just the

beginning.

47.     Defendant   Officers   returned   to

speak  with  the  female  relative.   At  this  point,

having  witnessed  the  officers  attack  and  chase



her  family  members,  she  refused  to  continue  speaking  with

them.  When she walked away from the officers, they started following her.  She ran away from Defendant Gonzalez and Officer Pineda to Mr. Holguin's house, the officers following her the whole way.

48.    Once she was safely inside the house away from the officers, Defendant Gonzalez and Officer Pineda lingered outside Holguin's home.

49.    Defendant Gonzalez wanted Ms. Ordonez's phone to prevent the recording of them getting out to the public.  They were not wearing anybody worn cameras, and they were likely unaware that they were also captured on surveillance video.  These officers hoped to send a message to Plaintiffs that exercising their First Amendment rights would not be tolerated.









50.      A few minutes later, other officers started arriving on scene: Officers J. Gallardo, C. Campa and C. Hernandez, along with Officer B. Jurado.  The officers gathered to discuss the situation, before approaching Plaintiffs' home.

51.      Without consent, a warrant, or exigent circumstances, Defendant Officers and Officer Jurado approached Plaintiff Holguin's home.  While standing in the driveway in front of his locked fence, a Defendant Officer shouted, "We want to talk to you," at Mr. Holguin.  He inquired if they had a warrant, which they did not.

52.      At this moment, Ordonez's sister shouted, "Dad!" at their father. Plaintiff Holguin, believing that more officers might be approaching his house from the back and concerned for his daughter's safety, turned around.

53.      Defendants Gonzalez, Campa, and Hernandez, acting more like the "rough" officers who founded the El Paso Police Department during the wild west

than as servants and protectors of the public, used that moment to jump the fence onto Plaintiffs' private property, claiming they did not need a warrant.[3]   Defendant Officer Hernandez led the way.



54.     Immediately, while his back was still turned to them, Defendant Officers surrounded Plaintiff Holguin.   Defendant Hernandez grabbed Plaintiff Holguin's right arm, and then, while he and other Defendant Officers shouted aloud for him to stop resisting—even though Holguin did not resist (and was not able to), Defendant Hernandez leg swept Plaintiff Holguin causing injury.

55.     Once Plaintiff was on the ground, Officer Gallardo grabbed Plaintiff

---

[3]  "Early in EPPD history, the city marshal was often the 'worst of the worse', [sic] due to the necessity of the city marshal having to always display a 'rough' reputation so they would not be challenged by the 'bad guys'. [sic]" https://www.elpasotexas.gov/police-department/. Accessed on December 5, 2022.

Holguin's left arm, and Officer Jurado grabbed Plaintiff Holguin's right arm, forcefully restraining him.  Officer Gallardo forced Plaintiff Holguin's left arm to the center of his back for Defendant Campa to handcuff; he then forcefully moved Plaintiff Holguin's right arm to the center of his back for Defendant Campa to handcuff.

56.     Motivated by malice, Defendant Campa tightened the handcuffs too tight, and she failed to double-lock them to prevent them from tightening further. These malicious actions caused Plaintiff Holguin injuries.  Gallardo and Campa then performed a pat down on Plaintiff Holguin.  Officers Jurado and Pineda helped him to his feet.

57.     Plaintiff Ordonez, seeing Defendant Officers and Officer Jurado attacking her father, stepped outside.  She joined her sister in shouting at the officers to let him go.  Officer Gallardo ordered Plaintiff Ordonez's sister to stop and have a seat.  The teenage girl complied and was placed in handcuffs.

58.     Ms. Ordonez, meanwhile, noticing that two officers were attempting to enter their home through the back door, yelled at them, advising Defendant Officers that they could not enter their home.  Upon hearing this, Defendant Hernandez grabbed her left arm, and Defendant Gonzalez grabbed her right arm.  Defendant Hernandez then leg-swept her, forcefully bringing her to the ground.

59.     All three Defendant Officers forcefully applied pressure to Ms. Ordonez's back.   Plaintiff Ordonez weighs about 110 pounds.   The force applied to her back by Defendants Hernandez, Gonzalez, and Campa affected her ability to breathe.   She lifted her head up, to articulate her lack of air flow as Defendant Officers were handcuffing her.



Before she could get the words to come out, Defendant Gonzalez—delivering her intended message—ran her fingers through the eighteen-year-old's scalp and slammed her head into the ground.   This caused Ms. Ordonez to suffer a busted lip and headaches.   Plaintiff's relative, who had just been attacked by her father, now watched from inside the home as the police officers she had called to assist her just brutally assaulted her family members.

60.     Defendant Hernandez forced Plaintiff Ordonez's left arm to the center of her back, while Defendant Gonzalez forcefully moved Plaintiff Ordonez's right arm to the center of her.   Defendant Gonzalez then handcuffed Plaintiff Ordonez. Defendants Gonzalez and Campa then performed a pat down on Plaintiff Ordonez.

61.     After Defendant Officers handcuffed Ms. Ordonez, they tried to open the back door to Holguin's home, claiming it was an attempt to retrieve all

"suspects."  Plaintiff Ordonez tried to say "Stop!" to the Defendant Officers, but she had difficulty as she was gasping for air.

62.    Defendant Officers then demanded that Mr. Holguin tell them the location of the key to unlock the gate that they had jumped over.  If he did not tell him, they threatened to throw the handcuffed Plaintiff over it.  Not wanting to be thrown, Plaintiff Holguin provided the location for the key, and Defendant Officers unlocked the gate.  Officers Jurado and Pineda escorted Plaintiff Holguin and Defendants Gonzalez and Campa escorted Plaintiff Ordonez in handcuffs to the waiting patrol cars.



63.    At no time did anyone give consent for the officers to enter Plaintiff Holguin's property.

## C. After the arrests

64.    After both sisters and their father were escorted to different patrol cars, Defendant Officers demanded the three family members identify themselves.  Ms.

Ordonez identified herself.  When Defendant Officers demanded that Mr. Holguin give them his name, he responded by asking for them to give him a lawful arrest.

65.    In retaliation, Defendant Gonzalez began hitting him with her knees. When he still failed to identify himself, she roughly pulled him out of the patrol car and began banging his left shoulder against the side of the car multiple times.

66.    As Defendant Gonzalez was holding onto Plaintiff Holguin by his handcuffs, every time she pulled on the handcuffs to slam him against the car, the handcuffs around his wrists—which had not been double-locked—tightened more causing permanent injury.  As handcuffs making a clicking sound as they tighten, Defendant Gonzalez was fully aware that Plaintiff Holguin's handcuffs had not been double-locked and were continuing to tighten.  Maliciously, Defendant Gonzalez did not loosen the handcuffs, nor did she stop to double-lock the handcuffs to ensure that they did not tighten further.   This increased tightening of Plaintiff Holguin's handcuffs caused him considerable pain and significantly diminished the amount of blood flow to his wrists and hands causing long-term injuries.

67.    While Defendant Gonzalez was attacking Plaintiff Holguin, another Defendant Officer tried to take his fingerprints on their phone.  At this point, Mr. Holguin provided his name because Defendant Gonzalez's actions were causing him significant pain in his shoulder, wrists, and hands.

68.    Plaintiffs' neighbor witnessed this abuse by Defendant Gonzalez.

69.     Shortly after, a Defendant John Doe arrived on scene.   Defendant Officers briefed this officer on the situation.   This officer did not intervene to release Plaintiffs from their arrests—arrests conducted without warrants for charges based on Plaintiff Ordonez filming her relative's statement at her request on the property at which she primarily lived.   Instead, Defendant John Doe condoned Defendant Officers' actions.



 

 

70.    After Defendant John Doe arrived, Pineda took several photos of the scene.[4]

71.    Shortly after this, the officers left the scene with the handcuffed Plaintiffs.  The family remained in handcuffs for ten to twelve hours at the substation, before they were transferred to the jail.  During this time, no one spoke to Plaintiffs.  They remained in handcuffs and chained to chairs.  Plaintiff Holguin was kept barefoot for their entire, hours-long stay.  His feet being forced on the cold cement floor caused both physical and psychological harm.  The very tight handcuffs

---

[4] The El Paso Police Department, a department with over 1,000 police officers and five regional command centers, purchased 34 BWCs in 2018.  EPPD did not purchase more cameras until March of 2022 (almost a year after the incident in question) when the El Paso City Council approved the $6.6 million purchase of 700 more BWCs and 410 mobile video recorders for the department to be used by patrol and traffic officers.

caused lasting damage to Mr. Holguin's wrists and hands.

72.     The Plaintiffs were eventually transferred to jail.  They were brought before a magistrate four hours later, and eventually bonded out by 6:30 A.M.

73.     Charges were initially brought against Plaintiffs.  Plaintiff Ordonez was charged with "Interfering with Public Duties," "Evading Arrest/Detention," and "Resisting Arrest or Transport." Plaintiff Holguin was charged with "Interfering with Public Duties" and "Resisting Arrest or Transport."  All criminal charges were dropped minutes before their arraignment.

74.     After the incident, Plaintiff Holguin, an electrician, has had trouble working because his wrists are in dire pain.  This prevents him from using and gripping certain tools and door handles.  He has so far been unable to meet the physical demands of his day-to-day job, instead, restricted to taking on very small troubleshooting maintenance jobs to make enough income for his family to get by.

75.     Plaintiff Holguin has also suffered psychological trauma.  He was arrested by officers who invaded his home without a warrant.  His daughters were assaulted in front of him.  He was treated like an animal when they threw him in a cell, handcuffed, with no shoes or socks while depriving him of necessities such as food and water.

76.     At no time did any officers intervene to help Plaintiffs.  Not one person questioned Defendant Gonzalez's conduct.  The city did not hold their officers

responsible by properly training or disciplining them. The rule of law was completely flouted; the Constitution trampled over with impunity. Plaintiffs now struggle to control their anxiety around El Paso police officers. This happened to them once. What is to prevent it from happening again?

### D. Despite officers engaged in unlawful and violative conduct that violated Plaintiffs' rights and caused them harm; Defendant City and its Chief stood by its officers with discretionary and inadequate investigation.

77.     Defendant Gonzalez did not have any non-retaliatory purpose for telling Plaintiff to stop filming. Ms. Ordonez was simply standing around a concerned family member, recording her relative's statement, when Defendant Gonzalez noticed what she was doing. Defendant Gonzalez did not threaten arrest until Plaintiff Ordonez declined to stop filming and began verbally criticizing her.

78.     Defendants Campa, Hernandez, and Gonzalez all used excessive force against Plaintiffs in retaliation for them verbally protesting the officers' actions and in retaliation for Plaintiff Ordonez filming the officers performing their duties in the public purview.

79.     Following these incidents, Plaintiff's previous criminal defense attorneys submitted complaints about the officers' actions to internal affairs, the FBI, and the Texas Rangers. The FBI reached out requesting interviews and copies of the videos. Plaintiff's attorneys provided the video, but declined to have his clients provide interviews until the criminal charges were dismissed.

80.     He also met with EPPD internal affairs officers Lieutenant John Lanahan, Sergeant Mike Valles, Sergeant Octavio Jauregui, Sergeant Falisha Milner, and Detective Heraclio Herrera, with Texas Ranger Juan Torres present. Plaintiffs' criminal defense attorneys showed these officers the footage from the incident and explained the situation.  The officers were reluctant to provide any meaningful information and informed the attorneys that they would be on a short timeline to take administrative action.  Plaintiffs have never heard the results of this internal affairs investigation, despite police policies and procedures requiring the City of El Paso to "notify the complainant in writing of the results of the investigation and final disposition."

81.     The City of El Paso prohibits disclosing the details of a case with anyone except the assigned internal affairs investigators, the officers' attorney, the officers' chain of command, and anyone else the Chief of Police wants to tell about it.

82.     Upon information and belief, Plaintiffs assert that through the Chief of Police's knowledge, consent, or direction, Mr. Holguin's complaints were shared throughout the department, with the purpose of permitting the City of El Paso to continue its intimidation of Plaintiffs.

83.     Following the making of these complaints, Mr. Holguin—who is extremely familiar with his neighborhood—noticed a sudden surge in EPPD officers

often driving past his and his neighbor's homes while shining searchlights around. This scared Plaintiffs.

84.    Mr. Holguin informed his criminal defense attorneys of the matter and provided them with a video.  While at his residence to speak with Mr. Holguin about his case, these attorneys witnessed this action firsthand.  The attorneys were then stopped by two officers, a sergeant, and a lieutenant.  These attorneys recorded their conversation with these officers.  When they inquired about the patrol officers' actions, they noted uncomfortable body language from the two supervisors.  These attorneys subsequently provided these videos to the FBI agent in charge of the investigation, along with an account of what happened.

85.    Plaintiffs have also not heard back from the FBI or the Texas Rangers on their complaints.

86.    Plaintiffs have also noticed an uptick in El Paso Police Department presence in close proximity to their home since the filing of this lawsuit.

### E. El Paso Policies, Practices, and Custom

87.    In Texas, it is not a crime to interfere with public duties by speech alone. Tex. Penal Code § 38.15(d).  Making speech a crime violates the First Amendment, and as noted by the United States Supreme Court, is what distinguishes a free nation

from a police state.[5]

88.    However, in El Paso, its Policymakers passed an ordinance that prohibits anyone from "interfering" with police officers "by words, sounds, or acts"—even though words and certain acts (such as filming police performing their public duties) are protected by the First Amendment.

---

**10.04.040 - Police officers—Obstructing prohibited.**

   No person shall, whether by words, sounds, or acts, hinder, obstruct or impede, or attempt to hinder, obstruct or impede, any police officer of the city in the performance of any official duty of such officer, other than the making of an arrest or the service of process.

(Prior code § 15-30)

---

89.    El Paso police officers are known for going after children and adults that film or verbally criticize them.  El Paso and its Policymakers are aware of complaints, concerns, and even litigation contesting these issues, but the City and its Policymakers refuse to make any changes.  There are enough instances in place—to include formal policies (such as the ordinance) to put the City on notice that its police officers—who are expected to interact with the public daily—would be in situations where members of the public using words and other First Amendment "acts" toward them is likely.

---

[5] "The freedom of individuals . . . to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state."  City of Houston, Tex. V. Hill, 482 U.S. 451, 462-63 (1987).

90.     On July 5, 2018, for instance, almost three years before this incident here, El Paso Police Officers Jose Rivas and Christian Sandoval detained a group of children celebrating a birthday at a local recreational center.  Officer Rivas, an officer with a history of violently attacking a minor,[6] drew his service weapon and pointed it at the group of children verbally criticizing him.  He later also drew his baton on the children.  A teenage boy filmed the incident.  When Officer Rivas saw the boy filming him, he had him arrested.  Prior to his arrest, the teenage boy passed his phone to his mother to continue recording the scene.  Officer Rivas also attempted to take the recording cell phone from the boy's mother, but she ran away from him to preserve the recording of the events.  When he could not take the phone from her, he pushed the boy's mother three to four times, causing her to fall on a child.  The teenage boy who started the recording was incarcerated for a week and falsely charged; these charges were later dismissed.[7]

91.     While Officer Rivas was placed on desk duty during the internal affairs investigation—despite his prior history of violent behavior toward a child and his clear retaliation against two citizens expressing their First Amendment rights—the

---

[6] Complaint and Demand for Jury Trial, *E.R. v. Jasso,* No. 3:18-CV-00298 (W.D. Tex. 10/09/2018), ECF No. 1.

[7] Complaint and Demand for Jury Trial, *Flores v. Rivas,* No. 3:18-CV-00297 (W.D. Tex. 10/09/2018), ECF No. 1.

Disciplinary Review Board unanimously exonerated him, and Officer Rivas returned to working at the El Paso Police Department.

92.     Despite complaints and lawsuits of similar conduct (such as with Officer Rivas)—which undoubtedly brought these matters to the attention of City of El Paso Policymakers back in 2018, policymakers still have not corrected their unconstitutional policies, practice, and custom regarding a citizen's First Amendment right to use words and to film their officers.  Policymakers also continue to have policies, practice, and custom in protecting their officers from public complaint through their discretionary internal investigation processes that allow Policymakers subjective control over what gets investigated and what does not.

93.     The publicly available El Paso Police Department Procedures Manual defines a department known as the Public Information Office (PIO).  This El Paso Police Department office is guided by a policy that "strives to define the balance between permitting the free flow of information to the public and the media, while protecting both the prosecution's case and the rights of the accused from possible prejudicial publicity."  Per Section 343.1, this office reports directly to *the Chief of Police*.  Section 343.11 further explains the purpose of this seemingly innocuous office: "[a]ll filming . . . of on-duty personnel must have prior approval from the Public Information Office."  This policy teaches El Paso Police Officers—counter to established law—that they cannot just be filmed by any person in a public area.

Individuals wanting to film them must request and receive permission from a department that answers directly to the Chief of Police before pointing their cameras in those officers' direction. Otherwise, these individuals are violating the city ordinance criminalizing First Amendment activity.

94.    El Paso Police Officers, like Officer Rivas and Defendant Gonzalez, are also taught by department policies—and by history and experience—that they do not need to worry about internal affairs investigations. Per the Internal Affairs Division Operations Manual, Sections 2.2(A)(4) and 2.2(A)(5), "[c]omplaints likely to result in criticism of the Department" and "[u]nusual complaints likely to be closely scrutinized" *must be brought to the attention of the Chief of Police*; further, according to Section 2.2(E), "IAD will investigate cases as delineated in the Procedures Manual *or as directed by the Chief of Police*" (emphasis added).

95.    Following internal investigations, per the El Paso Police Department Procedures Manual, Sections 903.1 and 903.2, "the Department has established a Disciplinary Matrix and Penalty Table . . . to determine the appropriate level of discipline," but "[t]he *Chief of Police* retains the right to depart from these guidelines" and "the right to modify or amend this matrix as needed without advanced notice." He also "retains the right to apply Educational Based Discipline (E.B.D.) as he deems necessary."

96.    The Chief of Police, who has control over all media representations of

the department and control over who gets permission to film police, also has control over the entire internal affairs investigation process, from initial complaint to final decision on discipline—without regard to any established procedure.

97.     So how can the Police Chief ever conclude that a police officer, that arrested an "unauthorized" individual from filming police, was ever in the wrong? He cannot, and he has not.

98.     Whatever the results of the investigation, per the Internal Affairs Division Operations Manual, Section 3.1(F), "The Internal Affairs Commander shall notify the complainant in writing of the results of the investigation and final disposition."   However, per Section 1.2(A)(1), "[t]he Internal Affairs Division Commander *reports directly to the Chief of Police*."

99.     Plaintiffs have never received final notice of the complaints they made against the officers that attacked them.   Nor have they been informed that any disciplinary action was taken against the officers who so fully invaded their lives and their homes—over a teenage girl filming her minor relative giving a statement.

100.   It is likely the City of El Paso completely disregarded Plaintiffs' complaints.  Plaintiffs utilized an attorney to file the complaints with El Paso Police Department's internal affairs division.   The manual gives officers discretion to ignore these complaints since they were not signed by Plaintiffs, but by their attorney.

101. El Paso policies, practice, and custom allowed its deliberate indifference toward Plaintiff Ordonez's First Amendment right to verbally oppose police and to film them.

102. El Paso policies, practices, and custom establishes deliberate indifference by authorizing officers to unlawfully seize (detain and arrest) Plaintiffs in direct response to Plaintiff Ordonez engaging in protected conduct when she verbally opposed police and filmed them.

103. El Paso policies, practices, and custom establishes deliberate indifference by allowing its Police Chief and officers to completely disregard Plaintiff's complaints made in direct response to Plaintiff Ordonez engaging in protected conduct when she verbally opposed police and filmed them.

104. El Paso policies, practices, and custom establishes deliberate indifference to Plaintiffs' rights under the First Amendment as the City criminalizes First Amendment activity and encourages police to violate Plaintiffs' clearly established rights under the First and Fourth Amendments of the United States Constitution.

105. The City of El Paso, its Policymakers, and its officers knew or should have known that Plaintiffs have a First Amendment right to film police and to verbally oppose their conduct. However, due to the City of El Paso's inadequate training policies, Defendant Officers were encouraged, and thought it was okay, to

violate Plaintiffs' constitutional rights.

## CAUSES OF ACTION

### COUNT II
### VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983
### (First Amendment – Retaliation)

106.   Plaintiffs restate and incorporate by reference each and every allegation set forth in all prior paragraphs.

107.   Plaintiffs assert this claim against Defendant Officers Gonzalez, Campa, and Hernandez, along with Defendant John Doe(s).

108.   Ms. Ordonez was engaged in constitutionally protected conduct of recording the police and then engaged in verbally criticizing police.

109.   Mr. Holguin was engaged in constitutionally protected conduct by verbally criticizing police, and by verbally denying them access to his fenced-in property without a warrant, exigent circumstances, or consent.

110.   Defendants Gonzalez, Campa, and Hernandez, in accordance with the policies of El Paso, seized Plaintiffs with excessive and unnecessary force. Defendant Officers, including John Doe Officers, then continued treating Plaintiffs Ordonez and Holguin inhumanely while they were in custody.

111.   Defendants Gonzalez, Campa, Hernandez assaulted Plaintiffs for the sole purpose of punishing them for exercising their First Amendment rights.

112.   Defendant Officer Hernandez retaliated against Plaintiff Holguin who

was not resisting by leg-sweeping him, forcefully dropping him to the ground, after he verbally opposed the officers' entry into his home.

113.   Defendant Officers Campa and later Gonzalez both retaliated against Plaintiff Holguin with excessive force.  Defendant Campa tightened the handcuffs around his wrists, and then failed to double-lock the handcuffs to prevent further tightening.  Defendant Gonzalez hit Plaintiff Holguin with her knees when he failed to identify himself.  When he continued to remain silent, she dragged him from the patrol car and repeatedly banged his left shoulder against the side of the car while holding onto his handcuffs, causing the handcuffs to repeatedly tighten.  Despite knowing that the handcuffs were far too tight, Defendant Gonzalez left them that way.

114.   Defendant Officers Gonzalez, Campa, and Hernandez retaliated against Ms. Ordonez by applying their body weight to her to restrict her breathing, and to punish her for verbally criticizing and filming Defendant Gonzalez and Officer Pineda.  Defendant Gonzalez then retaliated against Plaintiff Ordonez by slamming her head into the ground.

115.   Defendant Officers Gonzalez, Campa, and Hernandez retaliated against Mr. Holguin stripping him of his shoes and leaving him in a cold cell for a dozen hours without medical care, food, or water.

116.   These officers retaliated against Ms. Ordonez by purposefully leaving

her handcuffed in a cold cell for a dozen hours without medical care, food, or water.

117.   Officer Jurado and Defendant Officers had ample opportunity to process Plaintiffs through their facility and into the jail, but the officers wanted to send a message of intimidation and abuse solely because Plaintiffs were engaged in protected conduct.

118.   Each instance of retaliation would serve as a deterrent to a person of ordinary firmness from engaging in such protected conduct.

119.   The retaliation was motivated by Plaintiffs' protected speech.

120.   There is a causal connection between Plaintiffs' constitutionally protected conduct and the adverse retaliatory actions taken by Officer Jurado and the Defendants.

121.   The law is clearly established that individuals have a First Amendment right to record the police.  The law is equally established that Plaintiffs have right to verbally criticize police.

122.   It is clearly established that it is a First Amendment violation if an officer retaliates against someone in response to protected speech.  *Mesa v. Prejean*, 543 F.3d 264, 273 (5th Cir. 2008) (citing *Lewis v. City of New Orleans*, 415 U.S. 130, 134-35, (1974) (Powell, J., concurring)) ("Trained officers must exercise restraint when confronted with a citizen's anger over police action."); *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002) ("The First Amendment prohibits . . .

adverse governmental action against an individual in retaliation for the exercise of protected speech activities."); *see Hill.*, 482 U.S. at 462 ("[The] First Amendment protects a significant amount of verbal criticism and challenge directed at police officers.").  Defendants Gonzalez, Hernandez, and Campa violated this right.

123.   At all times relevant, Defendants were acting under color of State law.

124.   Defendants caused unreasonable and unnecessary force to be used against Plaintiffs for no lawful reason.  Defendants then refused to provide Plaintiffs with medical care, food, or water.

125.   Defendant Officers Gonzalez, Hernandez, and Campa would not have assaulted Plaintiff Ordonez during her arrest had she not been recording her relative giving her statement to Defendant Gonzalez and Officer Pineda, had she not verbally criticized the police after Defendant Gonzalez seized her phone, and had she not verbally criticized the police for the excessive force used against her father during his arrest.

126.   Defendant Officers Gonzalez, Campa, and Hernandez would not have assaulted Plaintiff Holguin during his arrest had he not tried to protect his daughter from being arrested for recording police officers, had he not verbally criticized them for engaging in such conduct, and had he not denied them access to his home.

127.   Defendants' acts deprived Mr. Holguin and Ms. Ordonez of the rights, privileges, and immunities guaranteed to citizens of the United States by the First,

Fourth, and Fourteenth Amendments to the Constitution of the United States, and in violation of 42 U.S.C. § 1983.

128.   As a direct and proximate result of Defendants' unlawful actions, Plaintiffs were harmed and suffered damages as a result.  In the alternative, Plaintiffs are entitled to nominal damages.

**COUNT III**
**VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983**
**(First Amendment – Retaliation)**

129.   Plaintiffs restate and incorporate by reference each and every allegation set forth in all prior paragraphs.

130.   Plaintiffs assert this claim against Defendant City of El Paso because of the conduct of the El Paso Police Department at the specific direction and policies of its police chief and one or more other Policymakers.

131.   Plaintiffs were engaged in constitutionally protected conduct of filing complaints with internal affairs.

132.   Consistent with practice, policy, or custom, Plaintiffs' complaint was not investigated or held in confidence.  Rather, the knowledge of the complaint was disbursed throughout the police department.

133.   Policymakers for the City of El Paso directed (or ratified the conduct) of officers driving by Plaintiffs' residence numerous times a day over several weeks and months, observing them, shining lights into their homes, with the purpose of

intimidating them and chilling Plaintiffs' First Amendment activity.

134.   The City of El Paso intentionally, knowingly, maliciously, recklessly, and unreasonably intimidating Plaintiffs in direct response to Plaintiff Holguin making complaints to internal affairs.

135.   As a direct and proximate result of this retaliation, Plaintiffs were harmed and suffered damages as a result.  In the alternative, Plaintiffs are entitled to nominal damages.

**COUNT VII**
**VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983**
**(Fourth Amendment – Excessive Force)**

136.   Plaintiffs repeat, reiterate, and re-allege each and every allegation set forth above and incorporate them as if fully set forth herein.

137.   Plaintiffs assert this claim against Defendants Gonzalez, Campa, and Hernandez.

138.   "The Fourth Amendment prohibits police from using more force than is reasonably necessary to effectuate an arrest." *Buehler v. Dear*, 27 F.4th 969, 980 (5th Cir. 2022).

139.   It is clearly established that Plaintiffs have the right under the Fourth Amendment to be free from excessive force during such a seizure. *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012) (citation omitted).

140.   Defendant Officers Gonzalez, Campa, and Hernandez, while acting in

the scope of their employment, and under the color of law, used greater force than necessary to effectuate a detention or arrest.

141.   Plaintiffs did not display any threatening or aggressive behavior to necessitate the use of any force.

142.   Plaintiffs had a clearly established, constitutional right to be free from excessive force.

143.   Defendants Gonzalez, Campa, and Hernandez's acts deprived Plaintiffs of their rights, privileges, and immunities guaranteed to citizens of the United States by the Fourth and Fourteenth Amendments to the Constitution of the United States, and in violation of 42 U.S.C. § 1983.

144.   Defendant Officers Hernandez, Gonzalez, and Campa used greater force than necessary when they piled on Ms. Ordonez (who weighs 110 pounds) with their full body weight causing her difficulty in breathing and caused her imminent and lasting harm.

145.   Defendant Gonzalez used greater force than necessary when she grabbed Ms. Ordonez's head, after she was handcuffed, and slammed it into the ground causing imminent and lasting harm.

146.   Defendants Hernandez used greater force than necessary when he jumped Plaintiffs' fence and leg-swept Mr. Holguin to the ground.  Mr. Holguin did not resist, but the officers attempted to justify this force by falsely claiming he was.

All he did was withheld consent to enter without a warrant and verbally opposed their conduct.

147.   Defendant Campa used greater force than necessary when she tightened the handcuffs around Plaintiff Holguin's wrists, and then failed to double-lock the handcuffs to prevent further tightening.  Defendant Campa used this force against Plaintiff Holguin even though he was not actively resisting.

148.   Defendant Gonzalez used greater force than necessary when she hit Plaintiff Holguin with her knees when he failed to identify himself.  Defendant Gonzalez used greater force than necessary when she dragged him from the patrol car and repeatedly banged his left shoulder against the side of the car while holding onto his handcuffs, causing the handcuffs to repeatedly tighten—and then left them that way for several hours causing ligament and nerve damage.  Defendant Gonzalez used this force against Plaintiff Holguin even though he was handcuffed and not actively resisting or fleeing.

149.   Defendant Officers Gonzalez, Campa, and Hernandez used this force against Plaintiffs even though they were not actively resisting.  It has long been established that "[o]fficers engage in excessive force when they physically strike a suspect who is not resisting."  *Id*. at 342.

150.   It is objectively unreasonable "for an officer to use injurious force against a non-resisting, non-dangerous individual who is not suspected of a serious

crime"—especially when "force is applied after the suspect has been restrained and subdued." *Aguirre v. City of San Antonio*, 995 F.3d 395, 412 (5th Cir. 2021). *See also Timpa v. Dillard*, 20 F.4th 1020, 1038 (5th Cir. 2021) (recognizing that . . . once a suspect has been handcuffed and subdued . . . an officer's subsequent use of force is excessive"); *Carroll v. Ellington*, 800 F.3d 154, 177 (5th Cir. 2015) ("The law was clearly established at the time of the deputies' conduct that, once a suspect has been handcuffed and subdued, and is no longer resisting, and officer's subsequent use of force is excessive." (citing *Bush v. Strain*, 513 F.3d 492, 501-02 (5th Cir. 2008)). Defendant Officers Gonzalez, Campa, and Hernandez violated this right.

151.   The force used by Defendants Gonzalez, Campa, and Hernandez was objectively unnecessary, excessive, and unreasonable under the circumstances. Rather, Defendants Gonzalez, Campa, and Hernandez embarked on a willful, malicious, reckless, and outrageous course of conduct that was intended to cause—and in fact caused—Plaintiffs to suffer.

152.   Defendants Gonzalez, Campa, and Hernandez knew their force was excessive but did it anyway.

153.   As a direct and proximate result of Defendants Gonzalez, Campa, and Hernandez's unlawful conduct, Plaintiffs suffered damages for their physical, mental, and emotional injury, and for pain, mental anguish, humiliation, embarrassment, and loss of reputation.

154.   Defendants Gonzalez, Campa, and Hernandez knew their force was excessive but did it anyway.

**COUNT VIII**
**VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983**
**(First Amendment – Prior Restraint)**

155.   Plaintiffs repeat, reiterate, and re-allege each and every allegation set forth above and incorporate them as if fully set forth herein.

156.   This cause of action is against Defendant Gonzalez and the City of El Paso.  The City of El Paso only authorizes the filming of police officers if permission is obtained from the PIO department managed by the Chief of Police.

157.   Pursuant to this policy, Defendant Gonzalez demanded that Plaintiff Ordonez stop recording while on her driveway, or risk having her phone taken from her (despite the lack of consent, warrant, or exigent circumstances).  When Plaintiff continued recording, Defendant Gonzalez demanded that Plaintiff leave her own property.  When Plaintiff continued recording, Defendant Gonzalez slapped Plaintiff Ordonez and her phone to seize it and to punish Ms. Ordonez.

158.   Defendant Gonzalez, other officers, including Pineda, Gallardo, Campa, and Hernandez, and Jurado are trained by the City of El Paso that they cannot be recorded unless the Chief of Police authorizes it, and any other recording of them is construed as obstruction.  Police officers are further trained that anyone that speaks to them or films them is interfering with them in violation of city

ordinance.

159.   This constitutes a prior restraint.  "Regulations that require speakers to obtain permits before speaking" are known as "prior restraints."  *Serv. Emps. Int'l Union, Loc. 5 v. City of Houston*, 595 F.3d 588, 596 (5th Cir. 2010).  Prior restraints "are disfavored and must be confined by 'narrow, objective, and definite standards.'" *Id*. (quoting *Shuttlesworth v. City of Birmingham, Ala*., 394 U.S. 147, 150-51 (1969)).

160.   First, the policies dictating a requirement to get permission prior to filming are inconsistent with Plaintiffs' First Amendment rights recognized by *Turner v. Driver*.  Second, the Chief of Police has complete discretion as to when to grant permission.  There is not any standard process.  It also does not matter that Plaintiff was in her own driveway.

## COUNT IX
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983
### (*Monell* Liability)

161.   Plaintiffs repeat, reiterate, and re-allege each and every allegation set forth above and incorporate them as if fully set forth herein.

**A. The City of El Paso's policies, practices, and custom that fail to recognize Plaintiffs' First Amendment rights constitute a moving force behind violating Plaintiffs' constitutional rights.**

162.   The City of El Paso is liable for all damages suffered by the Plaintiffs pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) and 42 U.S.C.

§ 1983, based on an official policy or custom of the City of El Paso police department, of which the City Council, the City Manager, the Mayor, and the Chief of Police all had actual or constructive knowledge that was a moving force behind the constitutional violates alleged herein.

163.   A municipal policy is "[a] policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority." *Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir. 1984) (per curiam). "[A] facially innocuous policy will support municipal liability if it was promulgated with deliberate indifference to the 'known or obvious consequences' that constitutional violations would result." *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 407 (1997)).

164.   As described above, the City of El Paso has an ordinance that criminalizes words and acts—even those protected by the First Amendment.  The City of El Paso has policies and procedures that give the Chief of Police complete discretion in training, investigating, and disciplining officers.

165.   The City of El Paso trains its officers on local ordinance, compliant procedures, and permits required before they can be filmed.

166.   Defendants Gonzalez, Campa, and Hernandez were acting under the

color of law and acting pursuant to customs, practices, and policies of the City of El Paso and the El Paso Police Department in regard to the use of force as authorized or ratified by the Policymakers—Chief of Police Greg Allen, City Manager Tommy Gonzalez, Mayor Oscar Leeser, and the El Paso City Council—when Defendants Gonzalez, Campa, and Hernandez deprived Plaintiffs of the rights and privileges secured to them by the First Amendment of the Constitution, before turning around and depriving Plaintiffs of the rights and privileges secured to them by the Fourth Amendment to the United States Constitution.  This was a direct result of the City of El Paso failing to provide proper training on citizens' right to film police officers, on the appropriate use of force, and on the limited exigent circumstances which permit warrantless entry, which is a violation of 42 U.S.C. § 1983.

167.   Detaining and arresting individuals are part of a police officer's duties. Police officers are expected to interact with members of the public that film them and verbally oppose them.  Policymakers know this.  They are required to implement policies that require appropriate and measured responses while also protecting the rights of citizens.  The policies, practices, and customs of the City of El Paso directly contradict these considerations.

168.   The Policymakers knew of these policies, practices, and customs but acted with deliberate indifference.  These violations should have been apparent to the Policymakers.

169.   The City of El Paso's policies, practices, and custom were the moving force behind Plaintiffs' constitutional violations.

**B. The City of El Paso failed to train its officers on a citizen's First Amendment rights and excessive use of force under the Fourth Amendment.**

170.   The City and its Policymakers failed to adequately train, supervise, and discipline its employees regarding the First Amendment rights of citizens to film and verbally criticize police, the appropriate use of force when citizens exercise their First Amendment rights.

171.   "A municipality's failure to train its police officers can without question give rise to § 1983 liability." *World Wide St. Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 756 (5th Cir. 2009).

172.   The failure to train, supervise, and discipline its employees in this manner reflects a deliberate indifference on the parts of the City of El Paso (including Councilmembers Peter Svarzbein, Alexsandra Annello, Cassandra Hernandez, Joe Molinar, Isabel Salcido, Claudia Lizette Rodriguez, Henry Rivera, and Cissy Lizarraga), the El Paso Police Department, Chief of Police Greg Allen, City Manager Tommy Gonzalez, and Mayor Oscar Leeser to the rights of the City's inhabitants and is actionable under 42 U.S.C. § 1983.

173.   Defendants Gonzalez, Campa, and Hernandez's violations of Plaintiffs' rights were obvious and a highly predictable consequence of insufficient training.

174.   While the City of El Paso knew based on a pattern of conduct of its officers in targeting individuals that film them, it also should have known that these interactions were likely given the permit requirements before filming is allowed, and the fact that the City criminalizes a person's words and other acts (such as filming police).

175.   Even without the pattern and knowledge of the City, this single incident is sufficient to show deliberate indifference on part of the City and its Policymakers because these facts that led to the violations are such that it should have been apparent to the City these constitutional violations were the highly predictable consequence of a particular policy or failure to train.  *Burge v. St. Tammany Parish*, 3369 F.3d 363, 373 (5th Cir. 2003) citing *Brown v. Bryan County,* 219 F.3d 450, 461 (5th Cir. 2000).

176.   The City and its Policymakers "know to a moral certainty that their police officers" are required to conduct certain functions, such as make arrests and secure arrest warrants.  *See, e.g.*, *City of Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989).

177.   The most basic function of is to know the constitutional limits of excessive force on restrictions on a citizen's First Amendment freedoms.  Without this knowledge, no officer could be expected to know how to deploy reasonable force or whether they are violating First Amendment rights.  A reasonably trained

officer would have recognized Plaintiff Ordonez's right to film the officers while they took her relative's statement and that there was no basis to use force on Plaintiffs.

178.   There is a casual connection between the failure to train and the violation of Plaintiffs' rights.  Had Defendant Officers Gonzalez, Campa, and Hernandez been properly trained as to Plaintiffs' rights they would have never attempted to stop Ms. Ordonez from filming, or retaliate against her or her father through excessive force.

179.   There is a constitutional duty to not interfere with Plaintiff's right to be free from excessive force that are likely to arise "in recurrent situations that a particular employee is certain to face." *Littell v. Houston Indep. Sch. Dist.*, 894 F.3d 616, 626 (5th Cir. 2018).

180.   Defendant City's failure to properly train its police officers, through an adequate training program, regarding First Amendment rights to film and verbally criticize police, and the use of force, was the proximate cause of the violations of Plaintiffs' constitutional rights.

**C. The City of El Paso failed to adequately supervise or discipline its officers for excessive force, and in failing to do so, ratified and encouraged the conduct of its officers.**

181.   The City of El Paso is liable for failing to supervise and discipline its officers for prior and current violations and the resulting lack of supervision:

(a)     The City and Police Chief failed to adequately supervise or discipline its employees in handling usual and recurring situations with which they deal;

(b)     Chief Allen and City Manager Gonzalez were deliberately indifferent to the need to supervise or discipline its officers or employees adequately;

(c)     The failure to adequately supervise and discipline its officers proximately caused the deprivation of Plaintiffs' constitutional rights; and

(d)     The City and its Policymakers failed to adequately supervise or discipline Defendant Officers for retaliating against Plaintiffs for exercising their First Amendment rights to record and/or verbally criticize the government.

182.   Despite having knowledge of Defendant Officers' violations of the El Paso Police Department's use of force policies, and other best police practices, Defendant City and its Policymakers refused to adequately discipline Defendant Officers.  The City's Policymakers were aware of the out-of-control behavior of Defendant Gonzalez and other Defendant Officers but failed to take any action.

183.   Instead, the City of El Paso allowed the Police Chief and his officers to exercise discretion in even evaluating a complaint where officers fulfill City policies, practices, and custom that prohibit and criminalize the recording and verbal criticism of on-duty police officers (without a PIO permit).

184.   Defendant City's failure to adequately supervise or discipline its officers was therefore the moving force behind Plaintiffs' damages.

185.   Defendant City's failure to investigate was a deliberate indifference of the conduct of the involved officers, and this failure was the proximate cause of the violations of Plaintiffs' constitutional rights.

**D. The City of El Paso failed to adequately investigate, and in failing to do so, ratified and encouraged the conduct of its officers, including Defendant Gonzalez.**

186.   In addition, Defendant City, as applicable, failed and refused to adequately investigate Defendant Officers' conduct.   Instead, Defendants were alerted to the investigation and were permitted (or instructed) to intimidate Plaintiffs over the course of several months.   In addition, the City's policies, practice, and custom give its Chief of Police discretion to accept or reject any complaint for any reason.   The IAD policies also allow officers to reject complaints if they are not in writing and signed directly by the Plaintiffs.

187.   Plaintiffs were never informed that their complaint was not accepted. They were not informed of anything at all.   Instead, following the making of the complaint, they suffered months of intimidation as different police officers continuously drove by their home, shone lights into it, and questioned anybody that went to the home (to include two of their attorneys).

188.   The City and its Policymakers knew that as a direct consequence of giving broad discretion to officers and the Chief of Police as to what complaints to accept, and what complaints to actually investigate, that there would be no real accountability of its officers that violate constitutional rights.

189.   The City of El Paso, by giving discretion as to what is investigated, and how investigations occur, knew that Plaintiffs would be subject to retaliatory

conduct that violates their First and Fourth Amendment rights, and that their complaints would be swept under the rug, because the Defendant Officers protected City policy, practice, and custom that prohibits and criminalizes filming and verbal opposition toward uniformed police officers.

190.   Defendant City's failure to investigate, or decision to accept a complaint in the first place, constitutes deliberate indifference of the conduct of the involved officers, and this failure was the proximate cause of the violations of Plaintiffs' constitutional rights.

191.   Defendant City is directly responsible for the individual Defendants' conduct described herein.

## <u>DAMAGES</u>

192.   **Actual damages**.   Defendants' acts or omissions were a proximate cause and the moving force behind the following actual damages suffered by the Plaintiffs, and Defendants should be held jointly and severally liable for the physical injuries, mental anguish, emotional distress, loss of potential income, disfigurement, medical treatment, and pain and suffering.

193.   **Punitive/Exemplary Damages against individual defendants in their individual capacities**.   Punitive/exemplary damages are recoverable under Section 1983 when the conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of

others.

194.   **Nominal damages** for First Amendment violations.

195.   Prejudgment and post judgment interest.

196.   Costs of court.

197.   Reasonable and necessary attorney's fees incurred by the Plaintiffs through trial, and reasonable and necessary attorney fees that may be incurred by Plaintiffs for any post-trial proceedings, or appeal, interlocutory or otherwise, pursuant to 42 U.S.C. § 1988.

198.   Plaintiffs seek unliquidated damages in an amount that is within the jurisdictional limits of the court.

## JURY DEMAND

199.   Plaintiff hereby demands a trial by jury on all issues so triable, pursuant to Fed. R. Civ. P. 38(b).

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray that Defendants, including Gonzalez, Campa, and Hernandez, be cited to appear and answer herein; that upon final trial hereof Plaintiffs have and recover judgment from Defendants, including Gonzalez, Campa, and Hernandez; actual and nominal damages, exemplary and punitive damages, pre-judgment interest at the legal rate; interest on the judgment at the legal rate; costs of court; attorney fees; and any other relief, both general and special, in law and equity,

to which Plaintiffs are justly entitled.

Respectfully submitted,

**GRABLE GRIMSHAW PLLC**

*/s/ Brandon J. Grable*
**BRANDON J. GRABLE**
Attorney-in-Charge
Texas State Bar No. 24086983
brandon@g2.law
1603 Babcock Road, Suite 280
San Antonio, Texas 78229
Telephone: (210) 963-5297
Facsimile: (210) 641-3332
**COUNSEL FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby affirm that on this 16th day of April 2024, the foregoing document was filed with the Court's CM/ECF electronic filing system and that a copy of said document was served upon all parties of record.

*/s/ Brandon J. Grable*
Brandon J. Grable